v.

**The STATE of Texas, Appellee.**

**Nos. 01–05–00146–CV, 01–05–00147–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

July 7, 2005.

Lois McCarnes, Galveston, TX, Richard H. Branson, League City, TX, for Appellant.

B. Warren Goodson, Jr., Asst. Dist. Atty., Galveston, TX, for Appellee.

Panel consists of Justices TAFT, ALCALA, and HIGLEY.

## OPINION

LAURA CARTER HIGLEY, Justice.

In these two accelerated appeals, appellant, J.M., raises three issues challenging the trial court's separate orders (1) that J.M. be involuntarily committed for temporary inpatient mental health services [1] and (2) that she be administered psychoactive medications. [2] J.M. contends that the evidence presented by the State at her commitment hearing is legally and factually insufficient to support the findings on which the order for temporary inpatient treatment is based. Concomitantly, J.M. also contends that the trial court's order to administer psychoactive medication must be reversed because such an order cannot stand unless a proper order for inpatient mental health services is also in place.

Because the evidence was legally insufficient to support the commitment order, we reverse and render judgment in both appeals.

## Background

On December 7, 2004, J.M. was brought to the University of Texas Medical Branch Hospital ("UTMB") in Galveston by her sister, with whom J.M. lived. The sister reported that J.M. suffered from bipolar disorder and that J.M. had not been taking her medication. The sister also reported that J.M. had been aggressive, attempting to kick family members, including some children. According to the sister, J.M. also had threatened suicide. The sister further reported that J.M. had been neglecting her personal hygiene by neither bathing nor brushing her teeth. At that point, J.M. was admitted to UTMB for inpatient care.

On December 21, 2004, Dr. Mireya Silva signed an application for court-ordered temporary mental health services, which was filed with the trial court. As applicant, Dr. Silva requested the trial court to involuntarily commit J.M. to the Austin State Hospital for a period not to exceed 90 days. The application was supported by two certificates of medical examination: one prepared by Dr. Silva and one by Dr. Waheedul Haque. Both doctors stated that they had examined J.M. and diagnosed her with bipolar disorder and depression with psychotic factors. With regard to the specific factual bases underlying J.M.'s need for commitment, both doctors referred to J.M.'s aggression toward her family and her refusal to take a bath or brush her teeth. Drs. Silva and Haque also stated that, while at UTMB, J.M. refused medication, refused to get out of bed, and remained mute for several days.

J.M.'s commitment hearing was held on December 29, 2004. Dr. Haque testified for the State. He restated his diagnosis that J.M. is mentally ill, suffering from "bipolar disorder mixed with psychotic features." Dr. Haque testified that his opinion is based on his personal knowledge of J.M. and from her medical records. J.M.'s medical records from her UTMB inpatient stay were also admitted into evidence.

When asked whether J.M. was likely to cause harm to herself, Dr. Haque responded affirmatively. He also responded affirmatively when asked whether J.M. (1) was "suffering from severe and abnormal mental, emotional, or physical distress" and (2) was "experiencing substantial mental or physical deterioration of her ability to

---

1. Trial court cause no. 2428; appellate cause number 01–05–00146–CV.

2. Trial court cause no. 2428A; appellate cause number 01–05–00147–CV.

function independently." Dr. Haque agreed that J.M.'s "deterioration" was exhibited by her inability to provide "for basic needs like food, clothing, health, or safety." Dr. Haque also agreed that J.M. was not able "to make a rational and informed decision about whether or not to submit to treatment."

According to Dr. Haque, J.M. was also a danger to others. Dr. Haque based this opinion on the information provided by J.M.'s sister that J.M. had been violent at home before her admission. Dr. Haque testified that J.M. had not shown any violent, aggressive, or threatening behavior while hospitalized.

Dr. Haque acknowledged that J.M. alleges that the sister who brought her to the hospital was trying to steal from her and had been abusing her. J.M. told Dr. Haque that her family had brought her to the hospital because she would not give them money. Dr. Haque stated that he did not believe J.M., but agreed that it was possible that the allegations against J.M.'s family were true. Dr. Haque also acknowledged that the sister against whom J.M. made the allegations of abuse was the source of much of the information on which he relied regarding J.M.'s mental health history.

J.M. also testified at the commitment hearing. She stated that, for the past 10 years, she had been treated with medication on an outpatient basis for depression and bipolar disorder. She testified that, during that time, she had worked as a nurse and led a normal life. J.M. stated that she had helped her family financially during that time and had made her sister's car payments. J.M. testified that she had not been working recently but that she was living from her savings. J.M. admitted that she had been previously hospitalized but would not directly admit that it had been for psychiatric care.

J.M. had moved from Houston to La Marque the previous year because her 16-year-old daughter was not doing well in school. J.M. and her daughter lived in her sister's house along with another sister and both sisters' children. Once at La Marque High School, her daughter excelled, and J.M. decided to stay in La Marque.

J.M. testified that she paid the utility bills and spent $400 a month on groceries while living in her sister's home. J.M. also testified that she cooked all the meals and babysat her sister's daughter while her sister attended school.

J.M. claimed that she never struck any of her family members; rather, J.M. testified that her sister had struck her when J.M. refused to give the sister money. According to J.M., the sister had told her, "Either you give us money or I will have you locked up." J.M. told the trial court that she was in the process of finding another place to live with her daughter when she was hospitalized at UTMB.

At the conclusion of the commitment hearing, the trial court, as factfinder, found that J.M. was mentally ill. It also found that J.M. was "likely to cause serious harm to herself and that at this time she is suffering from a mental, emotional, or physical distress and is unable to function independently." As a result, the trial court signed an "Order For Temporary Inpatient Mental Health Services," in which the trial court ordered J.M. committed to the Austin State Hospital for a period not to exceed 90 days.

Immediately following the commitment hearing, the trial court conducted a hearing on the State's application to administer psychoactive medication, which had been filed at the same time as the commitment application. Dr. Haque testified that the administration of psychoactive medication

was in J.M.'s best interest and was the proper course of treatment for her. According to Dr. Haque, J.M.'s condition would deteriorate if she did not take psychoactive medication. At the conclusion of the hearing, the court signed an "Order to Administer Psychoactive Medication," providing that certain classes of psychoactive medications could be administered to J.M. for the duration of her temporary commitment.

J.M. appeals both the "Order For Temporary Inpatient Mental Health Services" and the "Order to Administer Psychoactive Medication."

### Appeals from Orders are Not Moot

■ As a preliminary matter, we discuss our jurisdiction to decide these two appeals. This issue arises because the specified term of both orders—a period not to exceed 90 days—has expired. Thus, the question becomes whether J.M.'s appeals are moot. In *State v. Lodge*, the supreme court held that the doctrine of mootness does not apply to appeals from involuntary commitments for temporary hospitalization. 608 S.W.2d 910, 912 (Tex. 1980); *see Johnstone v. State*, 22 S.W.3d 408, 409 n. 1 (Tex.2000) (citing *Lodge* for this proposition). In reaching its holding, the *Lodge* court concluded that the "collateral consequences" exception to the mootness doctrine applies to temporary commitment orders. *Lodge*, 608 S.W.2d at 912. The collateral consequence in this context is the stigma that attaches to a mental health commitment. *See id.* The *Lodge* court explained that a "commitment to a mental hospital can engender adverse social consequences to the individual whether it is labeled a stigma or if it is called something else." *Id.* at 912 (internal quotation omitted). Such a stigma continues even after release is obtained.

*See id.* For this reason, the *Lodge* court summarized as follows:

> [W]e cannot agree that the reversal of the lower court judgment and dismissal of the cause as moot removes the collateral consequences of a commitment for mental health to the same extent as the reversal of the judgment after appellate review and the pronouncement in writing of the considerations impelling the decision favorable to the aggrieved party.

*Id.*

The next logical question is whether the underlying reasoning of the supreme court's holding in *Lodge* can be extended to J.M.'s appeal from the order to administer psychoactive medication. We conclude that it can be.

Only two other Texas courts of appeal have determined whether an appellate court has jurisdiction to decide an appeal from an order to administer psychoactive medication when the term of the order has expired. In this regard, the San Antonio Court of Appeals discussed in a footnote that the analysis found in *Lodge* extends to an order compelling psychoactive medication and concluded that an appeal from such an order is not moot. *See In re R.M.*, 90 S.W.3d 909, 910 n. 1 (Tex.App.-San Antonio 2002, no pet.).

In contrast, the Beaumont Court of Appeals held, in a per curiam opinion, that such an appeal is moot and dismissed the appeal for lack of jurisdiction. *See In re E.B.*, 962 S.W.2d 304, 305 (Tex.App.-Beaumont 1998, no pet.) The *E.B.* court recognized that Texas Health and Safety Code section 574.108 provides that a patient may appeal an order authorizing the administration of psychoactive medication in the same manner as provided for an appeal of an order requiring court-ordered mental health services. *Id.* (citing TEX. HEALTH & SAFETY CODE § 574.108). Following this

recognition, the court observed, "Though § 574.108 appears to offer appellant some form of due process, in actual practice, however, it does not, for by the time appeal is perfected and briefs filed, the commitment order most likely has expired by its own terms."[3] *Id.* Without further reasoning or discussion, the *E.B.* court concluded that the appeal was moot and dismissed it accordingly, without mentioning or expressly considering the apposite opinion in *Lodge*. *Id.* Because *E.B.* does not consider *Lodge*, which squarely addresses the very concern raised in *E.B.*, we decline to follow *E.B.'s* holding.

In this case, the trial court's order to administer psychoactive medication states, *inter alia*, that J.M. is subject to court-ordered inpatient mental health services and that J.M. has been determined by the trial court to be "mentally ill." The order also states that J.M.'s "mental illness renders [her] incapable of making medicinal decisions." The order provides that the State could administer the following classes of psychoactive medication to J.M.: antidepressants, antipsychotics, anxiolytics/sedatives/hypnotics, mood stabilizers, and stimulants. Given this language, we conclude that the reasoning of *Lodge* applies equally to J.M.'s appeal of the medication order. *See Lodge*, 608 S.W.2d at 912. That is, the stigma attached to being subject to an order to administer psychoactive medication, like that of an order for inpatient mental health treatment, is a collateral consequence that continues even after the term of the order has expired. *See id.* Accordingly, we conclude that we have jurisdiction over J.M.'s appeal of the order to administer psychoactive medication.

Having determined that we possess jurisdiction over these appeals, we turn to the merits of J.M.'s appellate challenges to the trial court's order for temporary commitment and to the order to administer psychoactive medication.

### Order for Temporary Commitment

#### A. Burden of Proof

■ We have recognized that "a person may not be deprived of his liberty by a temporary involuntary commitment unless there is a showing of a substantial threat of future harm to himself or others." *Taylor v. State*, 671 S.W.2d 535, 538 (Tex.App.-Houston [1st Dist.] 1983, no writ). To obtain an order for temporary commitment, the Texas Legislature has mandated that the State must prove its case by clear and convincing evidence. *See* Tex. Health & Safety Code Ann. § 574.034 (Vernon 2003). In this context, "clear and convincing evidence" means "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979). Specifically, Health and Safety Code subsection 574.034(a) provides that, on application for court-ordered temporary inpatient mental health services, the State must prove, by clear and convincing evidence, that the proposed patient is mentally ill. Tex. Health & Safety Code Ann. § 574.034(a). The State must also prove, by clear and convincing evidence, at least one of the following three criteria:

(2) as a result of that mental illness the proposed patient:

**3.** Interestingly, the *Lodge* court noted that the legislative purpose behind the statutory provision allowing for an appeal from an order of temporary commitment would be frustrated if the mootness doctrine were applied to such orders. *State v. Lodge*, 608 S.W.2d 910, 911 (Tex.1980).

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; or

(C) is:

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

*Id.*

Subsection 574.034(c) requires that the trial court specify which of the three criteria found in subsection (a) forms the basis of the commitment order, and our review is limited to the one(s) actually identified. TEX. HEALTH & SAFETY CODE ANN. § 574.034(c); *see Johnstone v. State,* 961 S.W.2d 385, 388 (Tex.App.-Houston [1st Dist.] 1997, no writ). In this case, the trial court made findings under the first and third criterion. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(A), (C)(i)-(iii). That is, the commitment order reflects that the trial court, as fact finder in this case, found that J.M. (1) is likely to cause serious harm to herself and (2)(i) is suffering severe and abnormal mental, emotional, or physical distress; (ii) is experiencing substantial mental or physical deterioration of her ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for her basic needs, including food, clothing, health, or safety; and (iii) is unable to make a ra-

tional and informed decision as to whether or not to submit to treatment. *See id.*

The Health and Safety Code requires that, to be clear and convincing under subsection 574.034(a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:

(1) the likelihood of serious harm to the proposed patient or others; or

(2) the proposed patient's distress and the deterioration of the proposed patient's ability to function." [4]

*Id.* § 574.034(d). The trial court need not specify which basis for clear and convincing evidence listed in subsection 574.034(d) supports its subsection 574.034(a) findings. *M.S. v. State,* 137 S.W.3d 131, 135 n. 5 (Tex.App.-Houston [1st. Dist.] 2004, no pet.). J.M. contends that the evidence is neither legally nor factually sufficient to show an overt act or a continuing pattern of behavior of the type defined in subsection 574.034(d).

## B. Standards of Review

█ Reaffirming its holding in *In re J.F.C.,* 96 S.W.3d 256, 264–65 (Tex.2002), the Texas Supreme Court recently held in *Southwestern Bell Telephone Co. v. Garza* that whenever the burden of proof is heightened beyond a mere preponderance of the evidence, e.g., when a fact must be proved by clear and convincing evidence, then the standard for legally sufficient evidence will be correspondingly heightened. 164 S.W.3d 607, 627 (Tex.2004); *accord Diamond Shamrock Refining Co. v. Hall,* 168 S.W.3d 164, 170 (Tex.2005) (applying *J.F.C.* heightened standard of review when burden in trial court was by clear and convincing evidence). As detailed, the State in this case was required to prove at

---

4. No indication exists in the record that J.M.   waived this requirement.

least one of the criteria listed in subsection 574.034(a) by clear and convincing evidence. Because the clear and convincing standard of proof in this case is the same as that involved in *Garza* and *J.F.C.*, we must apply the elevated standard of review defined in *J.F.C.* to determine whether the State presented legally sufficient evidence to support J.M.'s temporary commitment.[5] *See Garza,* 164 S.W.3d at 627. In this regard, we are guided by the following language from *J.F.C.*:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

96 S.W.3d at 266. If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. *Id.*

■ Likewise, the higher burden of proof alters the appellate standard of factual sufficiency review. *See In re C.H.,* 89 S.W.3d 17, 25–26 (Tex.2002) (holding that traditional factual sufficiency standard, in which court determines if finding is so against great weight and preponderance of evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias, is inadequate when finding must be based on clear and convincing evidence). In reviewing the evidence for factual sufficiency under the clear and convincing standard, we inquire "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.* at 25. In so doing, we must give due consideration to evidence that the factfinder reasonably could have found to be clear and convincing. *Id.* at 25. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *J.F.C.,* 96 S.W.3d at 266.

---

**5.** Other courts of appeal have adopted *J.F.C.'s* elevated standard of review when determining the legal sufficiency of the evidence supporting an order of temporary commitment. *See In re J.M.,* No. 13–03–00479–CV, 2005 WL 428823, at *1 (Tex.App.-Corpus Christi Feb. 24, 2005, no pet.) (mem. op.); *M.T. v. State,* No. 05–04–00647–CV, 2005 WL 225267, at *1 (Tex.App.-Dallas Jan. 31, 2005, no pet.) (mem. op.); *In re S.D.F.-W.,* No. 14–03–01398–CV,

2004 WL 2381884, at *3 (Tex.App.-Houston [14th Dist.] Oct. 26, 2004, no pet.) (mem. op.); *In re K.S.,* No. 02–03–00295–CV, 2004 WL 254267, at *2 n. 3 (Tex.App.-Fort Worth Feb. 12, 2004, no pet.) (mem. op.); *In re W.Y.,* No. 12–02–00321–CV, 2003 WL 22048072, at *5 (Tex.App.-Tyler, Aug. 29, 2003, no pet.) (mem. op.); *In re M.E.S.,* No. 04–02–00614–CV, 2003 WL 1240002, at *3 (Tex.App.-San Antonio Mar. 19, 2003, no pet.) (mem. op.).

## C. Legal Sufficiency of Evidence to Support Temporary Commitment Order

■ J.M. does not contest the trial court's finding that she is mentally ill. Rather, J.M. first contends that the State did not present legally sufficient evidence to show "a recent overt act" or a "continuing pattern of behavior" that tends to confirm either (1) the likelihood that J.M. would cause serious harm to herself or (2) J.M.'s distress and the deterioration of her ability to function to provide for her own basic needs, as required by subsection 574.034(d). *See* Tex. Health & Safety Code Ann. § 574.034(d).

■ Undeniably, Dr. Haque's testimony tracked the language found in section 574.034. However, an expert opinion recommending involuntary commitment must be supported by the factual bases on which it is grounded and not simply recite the statutory criteria. *See K.T. v. State*, 68 S.W.3d 887, 893 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *In re Breeden*, 4 S.W.3d 782, 784 (Tex.App.-San Antonio 1999, no pet.). That is, the expert should describe the patient's specific behaviors on which his or her opinion is based. *See In re K.D.C.*, 78 S.W.3d 543, 550 (Tex.App.-Amarillo 2002, no pet.). It is well-established that evidence establishing that an individual is mentally ill and in need of hospitalization is not evidence that the statutory standard for involuntary commitment has been satisfied. *K.T.*, 68 S.W.3d at 892; *Johnstone*, 961 S.W.2d at 388–89.

With these principles in mind, we turn to the evidence offered by the State as clear and convincing proof that J.M. should be subject to temporary mental health services.

■ Dr. Haque testified that he had learned from J.M.'s sister that J.M. had exhibited aggressive behavior toward her family before J.M. was hospitalized. J.M.'s UTMB medical records confirm that this information was reported by the family. J.M.'s aggressiveness toward her family may be evidence of an overt act. However, the recent overt act or continuing pattern of behavior proven by the State must relate to the criterion on which the judgment is based. *In re C.O.*, 65 S.W.3d 175, 181 (Tex.App.-Tyler 2001, no pet.). Here, the trial court did not find that J.M. is likely to cause harm to others. Such evidence of J.M.'s aggressiveness toward her family does not tend to confirm the likelihood that J.M. would cause serious harm to herself or J.M.'s distress and the deterioration of her ability to care for herself. *See In re N.D*, No. 12–04–00186–CV, 2004 WL 2955853, at *4 (Tex.App.-Tyler Dec. 22, 2004, no pet.) (mem. op.) (concluding that evidence of appellant's threat to stab husband is not evidence supporting commitment when trial court, as factfinder, made no finding that appellant was threat to others). Moreover, Dr. Haque testified, and her medical records indicate, that during her hospitalization J.M. exhibited no violent or aggressive behavior.

As pointed out by the State, J.M.'s medical records also indicate that J.M.'s family reported that she threatened suicide before her hospitalization. The records also reflect that J.M. was placed on suicide precautions during her hospitalization at UTMB. However, a threat of harm to the patient or others must be substantial and based on actual dangerous behavior manifested by some overt act or threats in the recent past. *K.D.C.*, 78 S.W.3d at 547. Here, no specific details were provided about the purported threats of suicide made by J.M. before her admission to UTMB. The record does not reveal exactly when the threats were made, specifically to whom they were made, under what circumstances the threats were made, or their severity. Importantly, no evidence

was presented that J.M. engaged in any recent overt act to actually harm herself at the time she made the threats or during her hospitalization.[6] *See Broussard v. State*, 827 S.W.2d 619, 622 (Tex.App.-Corpus Christi 1992, no writ) (concluding that expert opinion of "potential danger" to others is not sufficient to support commitment); *In re P.W.*, 801 S.W.2d 1, 3 (Tex. App.-Fort Worth 1990, writ denied) (reversing commitment order despite evidence that, *inter alia*, appellant called cousin asking about how to hold pistol to kill herself without causing a lot of pain). In fact, J.M.'s medical records indicate that she neither engaged in harmful behavior toward herself nor exhibited suicidal ideation during her three-week hospitalization at UTMB.

J.M.'s medical records also indicate that J.M.'s failure to take her medication was one of the reasons given by the family for bringing J.M. to UTMB. Dr. Haque testified that J.M. "often but not always" refused to take her medication.[7] This was cited by Dr. Haque as a factual basis confirming J.M.'s distress and deterioration of her ability to function.

This Court has previously held that refusal of medication is insufficient evidence of an overt act or a continuing pattern of behavior that demonstrates the patient's distress and the deterioration of the patient's ability to function. *Johnstone*, 961 S.W.2d at 389. Other appellate courts have arrived at the same conclusion despite evidence of mental illness. *See, e.g., In re I.H.*, No. 12–03–00222–CV, 2004 WL 527887, at *5 (Tex.App.-Tyler Mar. 17, 2004, no pet.) (mem. op.) (holding no evidence of overt act or continuing pattern of behavior that tended to confirm appellant's distress and deterioration of her ability to function, even though evidence presented showed that appellant thought people lived in her attic that were trying "to get her," appellant believed that her husband had artificially inseminated her, and appellant refused to take her medication because she believed it would harm baby); *Breeden*, 4 S.W.3d at 789 (reversing commitment order of schizophrenic patient who heard voices, refused medication, and was not eating properly); *Broussard*, 827 S.W.2d at 622 (concluding State presented no evidence of overt act or continuing pattern of behavior that demonstrated distress and deterioration of appellant's ability to function, even though paranoid schizophrenic patient refused medication because she believed it was poisonous). *But see G.H. v. State*, 94 S.W.3d 115, 116–17 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (divided panel affirmed temporary commitment order when evidence showed appellant re-

---

**6.** The patient history form in the UTMB medical records indicate that J.M.'s family reported that J.M. held a knife to herself in June 2004 and was hospitalized for a week following that threat. However, that was six months preceding her hospitalization at UTMB and would not qualify as a "recent" over act. This appears to be a separate suicide threat from the one at issue here. Moreover, Dr. Haque did not reference the earlier suicide threat in his testimony.

**7.** Dr. Haque testified that, in addition to his personal observations, he relied on J.M.'s medical records as a basis for his testimony.

J.M.'s medical records indicate that, during her three-week hospitalization at UTMB, J.M. was compliant in taking her medications. The only exception indicated was when J.M.'s medication was changed. J.M.'s medical records reflect that J.M. was upset about the medication change, stating that the new medication had "too many side effects." J.M. refused to take the new medication on December 17 and 18, 2004. Late on December 18, J.M. began taking her medication again. J.M.'s medical records indicate that she continued to take her medication until the commitment hearing.

fused medication).[8]  Moreover, in this case, the State offered no evidence indicating what medication J.M. needed or what effect J.M.'s refusal to take the medication had on her ability to function.  Like we did in *Johnstone*, we conclude that J.M.'s refusal to take her medication is legally insufficient evidence of an overt act or a continuing pattern of behavior that demonstrates J.M.'s distress and the deterioration of her ability to function.  *See* 961 S.W.2d at 389.

Dr. Haque also testified that J.M.'s "refusal to cooperate with treatment" was an example of an overt act or a continuing pattern of behavior that demonstrated J.M.'s distress and the deterioration of her ability to function.  Specifically, Dr. Haque cited J.M.'s refusal to allow the hospital staff to take her vital signs or to draw her blood for laboratory analysis.  Dr. Haque testified that the vital signs and lab work were necessary to aid in J.M.'s diagnosis.  However, the State never related—and it is not implicitly obvious—how this evidence showed a deterioration of J.M.'s ability to function independently to provide for her own basic needs.  Although Dr. Haque's opinion might be valid, the legislature has mandated that more than conclusory expert opinions are required before a person may be involuntarily committed for inpatient mental health services.  Evidence that J.M. refused to have her vital signs taken and blood drawn, like her refusal to take medication, is not evidence of an overt act or continuing pattern of behavior that would generally affect J.M.'s ability to function independently on a day-to-day basis without the imposition of court-ordered mental health services.

In sum, Dr. Haque's reliance on J.M.'s refusal to cooperate with treatment as a basis for hospitalization employs tautological reasoning that is insufficient to support commitment.  To employ such reasoning would be, in essence, to say that someone can be involuntarily committed and treated because the evidence shows that the patient will not be voluntarily treated.  Evidence supporting such circular reasoning is not legally sufficient to support a deprivation of J.M.'s liberty by temporary involuntary commitment.

The State also asked Dr. Haque to give examples of J.M.'s behavior indicating a recent overt act or a continuing pattern of behavior that confirms the likelihood that J.M. will cause serious harm to herself.  In response, Dr. Haque cited (1) J.M.'s refusal to bathe and brush her teeth, (2) J.M.'s refusal to get out of bed for several days at a time, and (3) J.M.'s refusal to talk to the staff at the hospital, i.e., remaining mute.  We cannot agree that such conduct rises to the level of a sufficient act or pattern of behavior to support court-ordered mental health services.

No evidence was presented that J.M.'s behavior resulted in any harm to her.  J.M.'s medical records, on which Dr. Haque testified that he relied to form his opinion, indicate that J.M. was "seclusive" and "isolatory," and that J.M. spent much time in bed or in her room.  The nursing notes state that J.M. would come out of her room to eat and to take her medication.  Dr. Haque testified, and the medical records show, that J.M. had no problem eating while in the hospital.  A number of entries in the nursing notes state that J.M. was out of bed and sitting in the hospital's "day room."

The medical records indicate that J.M. refused to answer questions related to her

---

8.  This Court, in *G.H. v. State*, 96 S.W.3d 629, 635 (Tex.App.-Houston [1st Dist.] 2002, no pet.), pointed out the shortcomings of the majority opinion's analysis found in *In re G.H.*, 94 S.W.3d 115, 116–17 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

condition when asked by the medical staff and was generally non-communicative. One entry described J.M. as "selectively" mute. Another entry in the progress notes indicates that J.M. told one of the staff members that she did not want to talk to the staff because she had nothing to say to them. Notes in the medical records also contain entries detailing comments made by J.M. during conversations that she had with the staff. However, what is lacking in the State's evidence is how J.M.'s proclivity to stay in bed and her "muteness" tended to confirm either the likelihood that she would harm herself or the deterioration of J.M.'s ability to function independently to provide for her own basic needs. *See In re R.L.I.*, 132 S.W.3d 539, 542–44 (Tex.App.-Tyler 2004, no pet.) (reversing temporary commitment order on legal insufficiency grounds where evidence showed, *inter alia,* that appellant was delusional, paralyzed by fear of dying, refused to get out of bed, and had difficulty communicating with people).

Dr. Haque testified that poor hygiene could result in infection. On cross-examination, Dr. Haque testified that not bathing is an indication that a person is "not taking care of themselves [sic]." According to Dr. Haque, not bathing can lead to "ill health" and "infections." When questioned how that would happen, Dr. Haque responded, "By not taking a bath for six months, you will know what happens." However, nothing in the record indicates that J.M. had not bathed for six months. To the contrary, nursing notes in J.M.'s medical records indicate that, while she did not engage in regular personal hygiene, J.M. took care of her own "oral hygiene" and "personal hygiene" on December 19 and 23, 2004. The nursing notes from the

19th stated that J.M. attended to her hygiene "without prompting" on that date. Moreover, even assuming that J.M.'s poor hygiene might result in physical problems at some point, to justify depriving an individual of her liberty, more than "potential" harm is necessary. *See C.O.*, 65 S.W.3d at 181–82.

When faced with evidence very similar to the evidence presented in this case, i.e., poor hygiene and "oppositional behavior," the Tyler Court of Appeals, in *In re B.S.,* concluded that such evidence merely demonstrated the appellant's mental illness, but did not rise to the level of being an overt act or pattern of behavior that demonstrated distress or tended to confirm a substantial deterioration of the appellant's ability to provide for his own basic needs. No. 12–02–00217–CV, 2003 WL 21260028, at *5 (Tex.App.-Tyler 2003, no pet.) (mem. op.). Similarly, though the evidence adduced at the commitment hearing demonstrates J.M.'s mental illness, it is not clear and convincing evidence that J.M. was a serious danger to herself or that she could not provide for her own basic needs, as found by the trial court.

Considering the evidence as we must, we conclude that a reasonable trier of fact could not have formed a firm belief or conviction that J.M. was likely to cause serious harm to herself or that J.M. is experiencing substantial mental or physical deterioration of her ability to function independently to provide for her basic needs. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(A),(C)(ii); *see also id.* § 574.034(d). Accordingly, we hold that the evidence is legally insufficient to support the trial court's Order For Temporary Inpatient Mental Health Services.[9]

---

**9.** The following are cases in which this Court held the evidence to be legally sufficient to support an order of temporary commitment:

*Goldwait v. State,* 961 S.W.2d 432, 435 (Tex. App.-Houston [1st Dist.] 1997, no writ) (presenting evidence that appellant appeared

J.M.'s first and third issues are sustained to the extent that they challenge the legal sufficiency of the temporary commitment order.

## Order to Administer Psychoactive Medication

▆▆▆▆ J.M. correctly contends that we must reverse the order to administer psychoactive medication to J.M. if the commitment order is reversed. An order authorizing the administration of psychoactive medication may be entered only if the patient is under a valid order for temporary or extended mental health services. *See* Tex. Health & Safety Code Ann. § 574.106(a)(1) (Vernon 2003). In the absence of a valid order for temporary or extended mental health services, the order authorizing the administration of psychoactive medication is not authorized by statute. *See id.* Therefore, because we reverse the trial court's order of temporary commitment, we also reverse the order to administer psychoactive medications to J.M. *See K.T.*, 68 S.W.3d at 894. We

sustain J.M.'s issues to the extent that they challenge the medication order on this ground.[10]

## Conclusion

As well-stated by the *Broussard* court, "While we are reluctant to deny court-ordered treatment to a woman who is obviously ill, we cannot lower the requirements imposed under section 574.034(c) of the Texas Mental Health Code regarding proof by clear and convincing evidence." *Broussard*, 827 S.W.2d at 622. The evidence offered in this case to support the commitment order was not clear and convincing evidence that J.M. would likely cause herself serious harm or that her condition had deteriorated to the point that she could not provide for her own basic needs. Accordingly, we reverse the Order For Temporary Inpatient Mental Health Services and the Order to Administer Psychoactive Medication signed by the trial court, and we render judgment denying the State's applications to commit

---

tired, requested suction supplies to "let" his blood, and jumped out of moving bus); *Mezick v. State*, 920 S.W.2d 427, 430–31 (Tex. App.-Houston [1st Dist.] 1996, no writ) (showing made that appellant had ongoing pattern of manic and depressive behaviors, had completely stopped eating, lost thirty pounds in one month, "steadfastly" refused all medications, and threatened suicide). In contrast, this Court has reversed commitment orders because the supporting evidence was legally insufficient in the following cases: *M.S. v. State*, 137 S.W.3d 131, 137 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (holding evidence that schizophrenic patient was combative, intrusive, and had "poor boundaries with others" was legally insufficient to show that patient is likely to cause serious harm to others); *G.H.*, 96 S.W.3d at 635 (concluding doctor's testimony that appellant refused to stop spitting on floor of hospital when admitted, walked around a common area of the hospital wearing wet clothes, began to disrobe in common area, and, in group therapy session, exhibited rapid, loud, and intense mood

changes, was legally insufficient to support finding that of recent overt act or continuing pattern of behavior tending to confirm substantial deterioration of appellant's ability to function independently to provide for her basic needs); *K.T. v. State*, 68 S.W.3d 887, 893 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (reversing commitment order when evidence showed that appellant suffered delusion that she was pregnant and had vaginal sutures, became verbally abusive to hospital staff, refused to eat while in hospital for fear that staff was putting medication in her food, and tried to escape from hospital); *Johnstone v. State*, 961 S.W.2d 385, 387–88 (Tex.App.-Houston [1st Dist.] 1997, no writ) (holding evidence of appellant's schizophrenia, auditory hallucinations, paranoia, irritability, and refusal to take medication not legally sufficient to meet required statutory burden).

10. Because we have found the evidence to be legally insufficient, we need not reach J.M.'s factual sufficiency complaints.

198

appellant for court-ordered temporary mental health services and to administer psychoactive medications to J.M.