

## In The
## Court of Appeals
## Sixth Appellate District of Texas at Texarkana

_____

No. 06-08-00028-CV

_____

THE STATE OF TEXAS FOR THE
BEST INTEREST AND PROTECTION OF C.R.W.

On Appeal from the County Court
Fannin County, Texas
Trial Court No. 2633

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

C.R.W. appeals the trial court's order authorizing temporary mental health services pursuant to TEX. HEALTH & SAFETY CODE ANN. § 574.034 (Vernon 2003).[1] On appeal, C.R.W. contends the evidence is legally and factually insufficient to support the findings required to support the trial court's order. We agree and will reverse the trial court's order.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

### A.       Dr. John Makowski, Staff Psychologist

Dr. Makowski prepared a certificate of medical examination for mental illness in which he diagnosed C.R.W. as having paranoid schizophrenia after C.R.W. had been in his care for one week. Further, he stated in the report that C.R.W. is mentally ill and as a result of that illness, is likely to cause harm to herself or others; or will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress and will continue to experience deterioration of her ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment. The basis for these opinions is an alleged statement by C.R.W.'s brother concerning C.R.W.'s threat to overdose on her medication if she cannot get back at least thirty of her cats that were taken by law enforcement. He also notes an alleged threat by C.R.W. to shoot her husband, but does not reveal the source of this information. He further noted some information that C.R.W. is

---

[1]In companion case, cause number 06-08-00029-CV, C.R.W. appeals from the related order authorizing administration of psychoactive medication. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 574.104, 574.106 (Vernon Supp. 2007).

2

paranoid and feels her brother is working with the judge to get her house condemned so that the brother can sell the land. The report contains no other factual information.

**B.      Dr. Erik Blois, Examining Physician**

Dr. Blois completed the second of the required certificates of medical examination for mental illness in which he diagnosed C.R.W. with depression, not otherwise specified. He, too, stated that C.R.W. is "mentally ill . . . [and] likely to cause serious harm to . . . herself . . . or . . . others . . . or will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress and will continue to experience deterioration of [her] ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment." He went on to conclude that C.R.W. "presents a substantial risk of serious harm to self or others if not immediately restrained, which is demonstrated by . . . the person's behavior; or by evidence of severe emotional distress and deterioration in [her] mental condition to the extent that the person cannot remain at liberty." He arrived at these conclusions based, in part, on C.R.W.'s brother's alleged statement that she was going to go into the country and overdose on her medication, and on information that a police report indicated that C.R.W. had threatened to shoot her husband. Our record does not contain either the brother's statement or the police report. Dr. Blois also noted that C.R.W. was under a restraining order based on alleged threats against her husband and commented on the number of cats and C.R.W.'s poor hygiene. The record also does not contain a copy of the restraining order to which Dr. Blois referred.

## C.     C.R.W., Proposed Patient

In the only testimony received at trial, C.R.W. explained some of the medical problems from which she suffers, one being multiple sclerosis. She also detailed how many of the medications she has taken for her illnesses that have made her ill and how certain drug regimes for one ailment interfere with the treatment for the other. She does take one pain medication. She testified that she regularly visits her gynecologist and her acupuncturist. She testified that the acupuncture has helped her significantly. She has converted to Buddhism. She also prefers a holistic approach to medicine, but does still go to her neurologist, gynecologist, and another doctor who practices more conventional medicine. The record suggests that she began medical treatment for some of her health conditions beginning in 1983.

She emphasized that she is "terrified" of the medicine that the state hospital wants to give her and described the hospital as "a very harsh and frightening place." She denied threatening to harm her husband, but admits that she has threatened to have him arrested for instances of alleged domestic violence. She also explained that her husband suffers from bipolar disorder and intermittent rage disorder; he has stopped taking the medication prescribed to him for the mental conditions because he lost his insurance when he lost his job.

She acknowledged that she and her husband had an argument, but denied threatening him and further stated that she does not have a gun. She also testified that she was not suicidal, that she was busy trying to take care of her ailing father, and that she would never hurt anybody. She is greatly

concerned about keeping her promise to her father to take care of him. She also expressed concern for her husband's well-being if she were to be committed to the state hospital. She suspects that her brother has had some involvement in getting her to this point in the involuntary commitment proceedings in an attempt to maintain control over their father's affairs.

The State cross-examined C.R.W. about the unusually high number of cats she and her husband had at their home; the State estimated the number at 200, including many who were living in the couple's attic. C.R.W. explained that they feed the cats and are trying to find homes for them. C.R.W. admitted that the house was a mess, due to the cats. She expressed her dissatisfaction for the condition of the house, but attempted to explain that the task of keeping everything clean was too great for her to do without her husband's help. She complained that he was unwilling to help. She was saddened when law enforcement took some of the cats. She also has three dogs. Raccoons live in the attic as well, after gaining entry through a broken window in the attic.

C.R.W. described the development of her health problems, the treatment she has received over the years, and how, at times, the couple was uninsured, preventing her from seeking additional medical treatment. The State also questioned C.R.W. on her spiritual relationship with her acupuncturist. C.R.W. responded that her acupuncturist served as her spiritual advisor. She explained that she has always maintained a love for animals and people and that she does not want to harm anything. She again denied ever threatening to harm her husband or herself and assumes

that her brother told the doctors that she had done so.  She further described her relationship with her brother, whose motives she questions, but against whom she holds "no ill will."

**D.      Trial Court's Findings**

The trial court found that C.R.W. did pose a risk of harm to herself and that, if untreated, she would continue to suffer and deteriorate.  It expressly declined to find that C.R.W. was likely to cause harm to others.  With that, we need not examine what little record there is here for evidence relating to C.R.W.'s alleged threats against her husband.

**II.      APPLICABLE LAW**

Orders for temporary mental health services are governed by the following provision:

(a)      The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:

(1)      the proposed patient is mentally ill;

(2)      as a result of that mental illness the proposed patient:

(A)      is likely to cause serious harm to himself;

(B)      is likely to cause serious harm to others; or

(C)      is:

(i)      suffering severe and abnormal mental, emotional, or physical distress;

(ii)      experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's

6

inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii)  unable to make a rational and informed decision as to whether or not to submit to treatment.

TEX. HEALTH & SAFETY CODE ANN. § 574.034.  If the judge or jury finds that the proposed patient meets the prescribed commitment criteria, the judge or jury must specify which criterion forms the basis of the decision.  TEX. HEALTH & SAFETY CODE ANN. § 574.034(c).

Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.  TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(2) (Vernon Supp. 2007); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).  To be clear and convincing under Section 574.034(a), the evidence must, unless waived,[2] include expert testimony and evidence of a recent overt act or a continuing pattern of behavior that tends to confirm (1) the likelihood of serious harm to the proposed patient or others or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.  TEX. HEALTH & SAFETY CODE ANN. § 574.034(d).  The overt act or continuing pattern of behavior "must relate to the criterion on which the judgment is based." *See In*

---

[2]We note that the waiver of the right to confront the State's witnesses does not touch on any issue concerning C.R.W.'s waiver of the requirement that the State present *any* expert testimony as to a recent overt act or a continuing pattern of behavior that would confirm either of the relevant findings under Section 574.034(a)(2).

*re F.M.*, 183 S.W.3d 489, 492 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

We pause to point out that there was no testimony taken from either of the above-referenced physicians. C.R.W. waived her right to cross-examine the doctors, and the parties agreed that expert testimony would be taken in the form of reports and written statements. Consequently, the only form of expert testimony the trial court had before it was the two doctors' completed certificates of medical examination for mental illness. The only testimony at the hearing on the State's application was C.R.W.'s own testimony. If the proposed patient waives her right of cross-examination, the trial court may admit as evidence the certificates of medical examination for mental illness, and the certificates admitted under this subsection constitute competent medical or psychiatric testimony on which a court's findings may be based alone. TEX. HEALTH & SAFETY CODE ANN. § 574.034(f); *In re E.T.*, 137 S.W.3d 698, 700 (Tex. App.—San Antonio 2004, no pet.). In other words, the doctors' certificates alone *could* constitute sufficient evidence to support the trial court's findings. Here, however, they do not.

## III. LEGAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT ORDER FOR TEMPORARY MENTAL HEALTH SERVICES

C.R.W. challenges the legal sufficiency of the evidence that supports the trial court's order authorizing temporary mental health services. The order for temporary mental health services states the trial court found, by clear and convincing evidence, C.R.W. is mentally ill and, as a result of that mental illness, is likely to cause serious harm to herself, and is suffering severe and abnormal mental,

8

emotional, or physical distress; experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and is unable to make a rational and informed decision as to whether or not to submit to treatment.

### A.      Standards of Review

Because the State's burden of proof is clear and convincing evidence, we apply a heightened standard of review. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *In re M.M.*, 184 S.W.3d 416, 417–18 (Tex. App.—Dallas 2006, no pet.). In reviewing the legal sufficiency of the evidence where the burden of proof is clear and convincing evidence, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the trier of fact resolved disputed facts in favor of its finding if a reasonable trier of fact could do so, and we must disregard all contrary evidence that a reasonable trier of fact could have disbelieved or found to be incredible. *Id.*

In reviewing factual sufficiency challenges, we review all the evidence in the record, both supporting and opposing the trial court's findings. *C.H.*, 89 S.W.3d at 27–29. We must give due consideration to evidence the trier of fact could reasonably have found to be clear and convincing. *Id.* at 25. Under the clear-and-convincing standard, we determine whether the evidence is such that

9

the trier of fact could reasonably form "a firm belief or conviction" as to the truth of the allegations sought to be established by the State. *Id.* We must consider whether disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266.

### B.      Evidence of Mental Illness

First, C.R.W. contends that the evidence is insufficient to support the trial court's finding that she is mentally ill. "Mental illness" is defined as "an illness, disease, or condition, other than epilepsy, senility, alcoholism, or mental deficiency, that: (A) substantially impairs a person's thought, perception of reality, emotional process, or judgment; or (B) grossly impairs behavior as demonstrated by recent disturbed behavior." TEX. HEALTH & SAFETY CODE ANN. § 571.003(14) (Vernon Supp. 2007).

Here, we have only the doctor's certificates of examination as a source of expert testimony on mental illness. While Dr. Makowski diagnosed C.R.W. with paranoid schizophrenia, Dr. Blois diagnosed her with depression not otherwise specified. Neither certificate clearly explains the basis for the respective diagnosis. Neither certificate describes how this condition has substantially impaired C.R.W.'s thought, perception, emotional process, or judgment or has grossly impaired her behavior. Reading the certificates generously, we can find indirect links between some description of the behaviors on which the doctors arrived at his diagnosis. Dr. Makowski's certificate roughly links the diagnosis of paranoid schizophrenia to some report, of unknown origin, he was given that

10

C.R.W. believed her brother and the trial judge were conspiring to get her house condemned so that the land could be sold. The certificate does not, however, go beyond that to explain how this behavior fits within the definition of mental illness. Dr. Blois' certificate also fails to provide any direct link between factual observations and his diagnosis of depression. It could be read from his certificate that his diagnosis was based on C.R.W.'s reaction to the seizure of some of the several cats at her house.

In *In re J.S.C.*, the testifying doctor explained the basis for his diagnosis of "schizophrenia, undifferentiated type, chronic, and acute exacerbation":

> When [J.S.C.] was at the MHMR Clinic, they found he was also catatonic. He was hallucinating. He was delusional and withdrawn. He was helpless. He was not able to care for himself, and he can not remember. He was admitted to SASH here; and when I saw him on the first visit, he was confused. His speech was fifty percent irrelevant. He was disoriented. He was totally out of it.

812 S.W.2d 92, 94 (Tex. App.—San Antonio 1991, no writ). The San Antonio court held this evidence sufficient to support the finding that J.S.C. was mentally ill. *Id.* On the other hand, certificates based on mere conclusions, such as that the proposed patient has "schizo affective disorder," without the factual observations that form the basis for that opinion, are insufficient. *See In re State for Mayberry*, 685 S.W.2d 121, 123 (Tex. App.—Amarillo 1985, no writ) (concluding certificates which constituted the only evidence supporting treatment did "not contain any descriptive factual observations of the doctors that would form a detailed basis for the conclusions and opinions of the doctors"). An expert diagnosis of mental illness alone is not sufficient to confine a patient for

11

compulsory treatment. *See Mezick v. State*, 920 S.W.2d 427, 430 (Tex. App.—Houston [1st Dist.] 1996, no writ). Expert opinions and recommendations must be supported by a showing of the factual bases on which they are grounded. *Id.*; *T.G. v. State*, 7 S.W.3d 248, 252 (Tex. App.—Dallas 1999, no pet.); *Lodge v. State*, 597 S.W.2d 773, 779 (Tex. Civ. App.—San Antonio), *aff'd*, 608 S.W.2d 910 (Tex. 1980).

Here, the record provides no information of personal factual observations of the doctors which lead them to diagnose C.R.W. as mentally ill. We cannot conclude the evidence presented here was sufficiently clear and convincing to form a firm conviction or belief that C.R.W. was mentally ill. The closest link we have to a factual observation to support a diagnosis is Dr. Makowski's description of a report of C.R.W.'s suspicions of her brother. We think this insufficient to meet the heightened evidentiary standard here. Nonetheless, even if there were sufficient evidence of mental illness, the State's evidence of the other required elements fails on this record. C.R.W. correctly directs us to authority that, even if the evidence of mental illness is sufficient, such evidence alone is insufficient to satisfy the statutory elements of Section 574.034. *See In re L.H.*, 183 S.W.3d 905, 911 (Tex. App.—Texarkana 2006, no pet.); *K.T. v. State*, 68 S.W.3d 887, 893 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Since evidence of mental illness alone is insufficient to justify involuntary commitment, we look to evidence that supports the other challenged elements of Section 574.034. Specifically, C.R.W. contends the evidence is insufficient to show an overt act or continuing pattern of behavior that would support a finding that C.R.W.

12

poses a risk of harm to herself under Section 574.034(a)(2)(A) and the multi-faceted finding under

Section 574.034(a)(2)(C). We will address those findings in turn.

### C. Evidence of a Recent Overt Act or Continuing Pattern of Posing a Risk of Harm to Self

Again, to be clear and convincing under Section 574.034(a), the evidence must include expert

testimony and evidence of a recent overt act or a continuing pattern of behavior that tends to confirm

(1) the likelihood of serious harm to the proposed patient or others or (2) the proposed patient's

distress and the deterioration of the proposed patient's ability to function. TEX. HEALTH & SAFETY

CODE ANN. § 574.034(d). The overt act or continuing pattern of behavior "must relate to the

criterion on which the judgment is based." *See F.M.*, 183 S.W.3d at 492; *J.M.*, 178 S.W.3d at 193.

The Houston–First Court reviewed the evidence to support a finding that a proposed patient

was likely to harm herself in *J.M.* 178 S.W.3d at 193. Evidence that J.M. threatened to harm

herself, standing alone, was insufficient to support a finding under Section 574.034(a)(2)(A). *Id.*

The court pointed out that no specific details were provided about the purported threats of suicide

made by J.M. before her commitment. *Id.* For instance, the record did not reveal exactly when J.M.

allegedly made the threats, specifically to whom she made those threats, or under what circumstances

she may have made the threats. *Id.* Importantly, no evidence was presented that J.M. engaged in any

recent overt act to actually harm herself at the time she made the threats or during her hospitalization.

*Id.* at 193–94. We see in *J.M.* that a threat of harm to the patient must be substantial and based on

actual dangerous behavior manifested by some overt act or threats in the recent past.[3] *See id.*; *In re K.D.C.*, 78 S.W.3d 543, 547 (Tex. App.—Amarillo 2002, no pet.).

We now turn to the doctors' certificates in the instant case to look for evidence of a recent overt act or a continuing pattern of behavior that confirms that C.R.W. is likely to harm herself. We find none. Dr. Makowski's certificate states "she told her brother that if she could not get back at least 30 of her 200+ cats that she would go into the country and overdose on medication." The doctor did not purport to have personal knowledge of this statement, it does not appear anywhere in the record, and her brother did not testify at trial. At trial, the only evidence concerning such a statement was C.R.W.'s denial of it. While the doctor might rely on the report of the brother's statement in forming an opinion, if the statement proves to be inaccurate, the basis for the opinion is obliterated. One purpose of the hearing before an impartial judge or jury is to establish the factual basis for the commitment. Here, the record is totally void of any evidence from a witness with

---

[3]We examined a doctor's notation of a patient's statements about death:

> In Dr. Fagan's certificate, he referred to the family's report that R.G. had been "stating he wants to die." This phrase is the only reference to such statements. Dr. Chadalavada did not testify to any such statements by R.G. From this short, general reference in Dr. Fagan's certificate, we cannot determine the context in which R.G. may have made statements to this effect. And, certainly, there is no evidence R.G. attempted suicide or purposely harmed himself. So, we cannot conclude that Dr. Fagan's five-word notation in his certificate constitutes evidence of a recent overt act or continuing pattern of behavior that tends to confirm the likelihood of serious harm to R.G. or a substantial deterioration of R.G.'s ability to function independently.

*In re R.G.*, No. 06-05-00147-CV, 2006 Tex App. LEXIS 851, at *9–10 (Tex. App.—Texarkana Feb. 2, 2006, no pet.) (mem. op.).

14

personal knowledge that C.R.W. made such a statement. Even taken as true, we do not know the context in which it was said and note that this was simply a statement and that there is nothing in the record that would suggest it was anything other than an isolated statement, not a continuing pattern of behavior. The record shows no evidence that C.R.W. made any recent overt act to actually harm herself even if she did make the statement. This evidence, while the closest we find to be sufficient, fails to reach the heightened standard of review here.

Similarly, Dr. Blois noted this alleged threat to overdose on her medication. Again, though, with no evidence that C.R.W. took any action in furtherance of this threat, no evidence as to the context or tone of the statement, and no evidence that she engaged in a continuing pattern of behavior that would confirm that C.R.W. is, indeed, at risk of harming herself, we cannot say that this evidence is clear and convincing. We conclude that the evidence is legally insufficient to support the trial court's finding that C.R.W. is likely, as a result of her mental illness, to harm herself.

D.     **Evidence of a Recent Overt Act or a Continuing Pattern of Distress and Deterioration**

Next, we examine the record for evidence of a recent overt act or a continuing pattern of behavior that confirms the multifaceted finding under Section 574.034(a)(2)(C). We must find sufficient evidence of the following three elements: 1) the patient is suffering severe and abnormal mental, emotional, or physical distress, 2) the patient is experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's

basic needs, including food, clothing, health, or safety; and 3) the patient is unable to make a rational and informed decision as to whether or not to submit to treatment. TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(C).

The doctors' certificates, again the only expert testimony for our review, provide no evidence concerning a recent overt act or continuing pattern of behavior that would serve to confirm that C.R.W. was, at the time she was committed to the state hospital, suffering severe and abnormal mental, emotional, or physical distress. We learn from C.R.W. herself that she does suffer from some physical ailments and does seek regular treatment, when she is covered by health insurance, for those ailments. The record suggests she has done so for years.

For the evidence to be legally sufficient to support the trial court's findings, the record would also have to show that, when C.R.W. was committed, she was experiencing substantial mental or physical deterioration of her ability to function independently, which was exhibited by her inability, except for reasons of indigence, to provide for her basic needs, including food, clothing, health, or safety. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(C). Dr. Blois' certificate does touch on C.R.W.'s poor hygiene and the fact that she was living in a house with over 200 cats. This might serve as some evidence of a continuing pattern of behavior—collecting cats—that confirms deterioration of her ability to function independently. C.R.W. admitted that she could not keep the house clean under those circumstances without help from her husband. The inability to maintain a

16

somewhat sanitary home could, arguably, call into issue C.R.W.'s ability to provide for her own health and safety.

We share the Houston–First Court's reluctance to conclude that such evidence, without more, demonstrates a continuing pattern of behavior that would confirm mental or physical deterioration:

> [E]vidence of the effects of mental illness does not necessarily establish evidence of *substantial* mental or physical deterioration unless the effects impair a person's ability to function independently to provide for basic needs. For example, poor grooming is insufficient "to justify depriving an individual of her liberty." *J.M.*, 178 S.W.3d at 195. Poor hygiene and "oppositional behavior" also demonstrate mental illness, but alone do not rise to the level of an overt act or pattern of behavior that confirms a substantial deterioration of a person's ability to function independently to provide for her basic needs. *Id.* Evidence of poor insight and judgment, lack of trust towards others, insomnia, and diminished weight are likewise serious health problems, but they must be coupled with evidence that Armstrong is suffering substantial deterioration of her ability to provide for her basic needs. *See id.* Although the evidence shows that Armstrong is mentally ill, has physical health problems, and has been previously hospitalized for the mental illness, the State offered no testimony that, as a result of her mental condition, she is unable to function independently as exhibited by her inability to provide for her basic needs.

*Armstrong v. State*, 190 S.W.3d 246, 252 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Here, Dr. Blois does not provide details into the condition of the house or about C.R.W.'s hygiene. We do later learn a little bit more from C.R.W. herself. She explained that she was unable to properly care for herself at the time, that she was "a mess and stinky right now" because she was rushed into state custody and was not able to take any of her "stuff," presumably grooming products. She also expressed dissatisfaction for the condition of the house; she told her husband that she did not want to live in such conditions. Although not expert testimony, as required, C.R.W.'s testimony

17

gives us a bit more insight into the situation. Further, we note that, by the time the hearing took place, the record demonstrates that law enforcement seized many of the cats from the home. While there is some evidence of this second element under Section 574.034(a)(2)(C), it falls short of sufficiently clear and convincing. A reasonable trier of fact could not have formed a firm conviction or belief as to the truth of these findings based on this evidence.

Finally, we find no evidence that C.R.W. is unable to make a rational and informed decision as to whether or not to submit to treatment. To the contrary, the record shows that C.R.W. has sought regular treatment for her several health problems and has learned that she is sensitive to several medications. She explains that she is able to take one certain pain medication, but most others make her ill. She has explored holistic medicine and acupuncture. She pursues these avenues in conjunction with her "regular" doctors for her physical and mental health. Evidence of a decision to pursue treatment other than or in conjunction with conventional medicine does not satisfy this element. The record is void of evidence that C.R.W. is unable to make a rational and informed decision as to whether to submit to treatment.

## IV.    CONCLUSION

We reverse the trial court's order and render judgment denying the State's application for mental health services. Having rendered such judgment, we accordingly order C.R.W.'s immediate release from the institution to which she has been committed. *See* TEX. HEALTH & SAFETY CODE

18

ANN. § 574.033(b) (Vernon 2003); *see also* TEX. R. APP. P. 43.2(c). Our mandate will issue immediately upon motion, should appropriate action not be taken in accordance with this opinion.

                                         Jack Carter
                                         Justice

Date Submitted:     April 24, 2008
Date Decided:      April 25, 2008