NO.
12-05-00425-CV

 

IN THE COURT OF APPEALS 

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

THE STATE OF TEXAS FOR        §                      APPEAL FROM THE 

 

THE BEST INTEREST AND          §                      COUNTY COURT AT LAW

 

PROTECTION OF M.D.      §                      CHEROKEE
COUNTY, TEXAS

                                                                                                                                                           


MEMORANDUM OPINION

            M.D. appeals
from an order for temporary inpatient mental health services.  In his sole issue on appeal, M.D. asserts the
evidence is legally and factually insufficient to support the order.  We affirm.

 

Background

            On
December 20, 2005, an application for court ordered temporary mental health
services was filed  requesting the trial
court to commit M.D. to the Rusk State Hospital (the “Hospital”) for a period
not to exceed ninety days.  At the time
the application was filed, M.D. was a patient at the Hospital.  The application was supported by two
physician’s certificates of medical examination for mental illness. The first
certificate stated that, on December 19, 2005, Dr. Cuellar evaluated and
examined M.D. and diagnosed him with schizoaffective disorder, bipolar type.
According to  Cuellar, M.D. was mentally
ill and was likely to cause serious harm to others. As the basis for this
opinion, Cuellar reported that M.D. verbalized nonstop hostile, critical
remarks against his wife and daughter and, on December 18, threatened to load
his gun and shoot anybody in his way. Cuellar stated that M.D. presented a
substantial risk of serious harm to himself or others if not immediately
restrained, demonstrated by M.D.’s behavior or by evidence of severe emotional
distress and deterioration in his mental condition to the extent that M.D.
could not remain at liberty.  As the
basis for this opinion, Cuellar stated that M.D. expressed marked hostility to
his wife and daughter and, on December 18, threatened to shoot his wife and
daughter for standing in his way. 

            On
December 21, 2005, Dr. G. Paul Kula evaluated and examined M.D. and diagnosed
him with bipolar disorder, type I, manic with psychotic features.  According to Kula, M.D. was mentally ill and
was likely to cause serious harm to others, was suffering severe and abnormal
mental, emotional, or physical distress, was experiencing substantial mental or
physical deterioration of his ability to function independently, and was unable
to make a rational and informed decision as to whether or not to submit to
treatment.  As his basis for this
opinion, Kula stated that, on December 19, M.D. stated that there was nothing
wrong with him, that his wife had the problem, and that he would shoot anyone
who got in his way.  M.D. also threatened
to shoot his wife and daughter and was hostile and threatening to medical
staff.  Kula stated that M.D. presented a
substantial risk of serious harm to himself or others if not immediately
restrained, demonstrated by M.D.’s behavior or by evidence of severe emotional
distress and deterioration in his mental condition to the extent that M.D.
could not remain at liberty.

            The
hearing on the application was held on December 27.  At trial, Kula testified that M.D. suffered
from bipolar I disorder, manic, with psychotic features.  According to Kula, he concluded that M.D. was
likely to cause serious harm to others because, in the presence of the head
nurse and while on the telephone, he threatened to kill his wife and made
threats to his wife.  Kula stated that
M.D. threatened medical staff if they tried to interfere with his making a
telephone call and that M.D.’s wife did not want him to continue making
telephone calls. 

            Kula
concluded that M.D. was suffering from severe mental, emotional, or physical
distress because, at the time of examination, he was clearly manic, psychotic,
and grandiose with persecutory delusions. 
He claimed that his wife had all the problems and needed to be treated
for mental illness and that he was being framed and sent to the Hospital.  According to Kula, M.D. denied that he loaded
a gun to shoot his wife.  Kula saw M.D.
as a clear and present danger to his wife and daughter because he allegedly
loaded a gun and threatened to kill them. 
Kula stated that, allegedly, M.D.’s family was terrified of him.  Kula testified that M.D. received three
emergency medications for threatening behavior towards the nursing staff, even
after beginning his medication regime. According to Kula, M.D. postured in a
physical manner and frightened the staff. 
Kula believed that the circumstances involved M.D. being directed to go
places, such as when it was time to eat or time for bed.  Kula testified that, without treatment, M.D.’s
condition would worsen, his hospitalization would be prolonged, and he would
develop medication resistance, making it more difficult to get M.D. back to a
neutral point.

            Kula
stated that M.D. was unable to care for himself because he denied having any
type of mental or physical illness, including 
high blood pressure, bronchial asthma, and COPD (chronic obstructive
pulmonary disease).  When M.D. was
admitted to the Hospital, his blood pressure was high enough to be dangerous to
his health.  Kula stated that M.D. had
been on medication for his high blood pressure, but stopped taking that
medication as well as all his other medications. According to Kula, M.D.
flushed his medication down the toilet, claimed he did not need it any longer,
and became manic and psychotic.  Kula
believed that M.D.’s refusal to take his high blood pressure medication was
caused by his mental illness due to his lack of insight.  At the time of the hearing, Kula admitted
that M.D. was taking his medications by written consent and his blood pressure
was stabilized.  Kula admitted that none
of M.D.’s physical illnesses would cause pain, but could cause a great deal of
discomfort.  According to Kula, M.D. is
able to feed and clothe himself, understands the danger of remaining in a
burning building, understands the inherent danger of sitting in a fire ant bed,
and would probably go to the doctor if he suffered a broken arm. 

            M.D.
testified that his wife takes care of his food when he is out of the
Hospital.  Although M.D. stated that he
had a family physician, he admitted that he had not seen him in a long
time.  M.D. admitted having asthma, but
stated that he did not take his medication because he did not need any right
now.  M.D. testified that he takes only a
baby aspirin and, if needed, a pill that is a little stronger.  Then, M.D. denied taking any medications,
denied having high blood pressure, and denied ever having medication for high
blood pressure.  He denied threatening
his wife and daughter “to the point that I would do anything at all.”  He also stated “that opened up a new ball
game.”  Again, M.D. denied threatening
his wife or making a telephone call to his wife.  He denied threatening his daughter, but
remarked that his “daughter does whatever her mother says to.”  M.D. denied loading a rifle and threatening
to shoot his immediate family.  However,
he stated that he had a gun and, if someone knocked on his door at 1:00 a.m.
and came in, “it’s my business once they come in the door.”  M.D. denied getting into fights at the
Hospital or threatening anyone at the Hospital. 
If released, M.D. would go straight home to look up his wife and then to
his daughter’s home or workplace.  M.D.
stated that he loved his wife and guaranteed that he would not hurt her.  He asked if his wife was going with him to
see his son, but stated that she probably would not as she did not even go to
his sister’s or daughter’s funeral. 
According to M.D., this was his fourth marriage. 

            On
December 27, the trial court found that M.D. was mentally ill, was likely to
cause serious harm to others, and was suffering severe and abnormal mental,
emotional, or physical distress, was experiencing substantial mental or
physical deterioration of his ability to function independently, exhibited by
M.D.’s inability, except for reasons of indigence, to provide for his basic
needs, including food, clothing, health, or safety, and was unable to make a
rational and informed decision as to whether or not to submit to
treatment.  The trial court entered an
order for temporary inpatient mental health services, committing M.D. to the
Hospital for a period not to exceed ninety days.  This appeal followed.

 

Sufficiency
of the Evidence

            In
his sole issue, M.D. argues that the evidence is neither legally nor factually
sufficient to support the order of commitment. M.D. contends that the testimony
fails to show an overt act or a continuing pattern of behavior that tends to
confirm the likelihood of serious harm to others or his distress and
deterioration of his ability to function. 
The State disagrees.

Standard of Review

            In
a legal sufficiency review where the burden of proof is clear and convincing
evidence, we must look at all the evidence in the light most favorable to the
finding to determine whether a reasonable trier of fact could have formed a
firm belief or conviction that its findings were true.  In re J.F.C., 96 S.W.3d 256,
266 (Tex. 2002).  We must assume that the
fact finder settled disputed facts in favor of its finding if a reasonable fact
finder could do so and disregard all evidence that a reasonable fact finder
could have disbelieved or found incredible. 
Id.  This does not
mean that we are required to ignore all evidence not supporting the finding
because that might bias a clear and convincing analysis.  Id. 








            The
appropriate standard for reviewing a factual sufficiency challenge is whether
the evidence is such that a fact finder could reasonably form a firm belief or
conviction about the truth of the petitioner’s allegations.  In re C.H., 89 S.W.3d 17, 25
(Tex. 2002).  In determining whether the
fact finder has met this standard, we consider all the evidence in the record,
both that in support of and contrary to the trial court’s findings.  Id. at 27-29.  Further, we must consider whether disputed
evidence is such that a reasonable fact finder could not have reconciled that
disputed evidence in favor of its finding. 
In re J.F.C., 96 S.W.3d at 266.  If the disputed evidence is so significant
that a fact finder could not reasonably have formed a firm belief or
conviction, then the evidence is factually insufficient.  Id.  

Involuntary Commitment Order

            The
trial judge may order a proposed patient to receive court ordered temporary
inpatient mental health services if the judge or jury finds, from clear and
convincing evidence, that the proposed patient is mentally ill and, as a result
of the mental illness, he is likely to cause serious harm to himself, is likely
to cause serious harm to others, or is (i) suffering severe and abnormal
mental, emotional, or physical distress, (ii) experiencing substantial mental
or physical deterioration of his ability to function independently, which is
exhibited by his inability, except for reasons of indigence, to provide for his
basic needs, including food, clothing, health, or safety, and (iii) unable to
make a rational and informed decision as to whether or not to submit to
treatment. Tex. Health & Safety Code
Ann. § 574.034(a) (Vernon 2003). 

            To
be clear and convincing under this statute, the evidence must include expert
testimony and, unless waived, evidence of a recent overt act or a continuing
pattern of behavior that tends to confirm either the likelihood of serious harm
to the proposed patient or others or the proposed patient’s distress and the
deterioration of his ability to function. 
Tex. Health & Safety Code
Ann. § 574.034(d) (Vernon 2003). 
Clear and convincing evidence means the measure or degree of proof that
will produce in the mind of the trier of fact a firm belief or conviction as to
the truth of the allegations sought to be established.  State v. Addington, 588 S.W.2d 569,
570 (Tex. 1979).  The statutory
requirements for an involuntary commitment are strict because it is a drastic
measure.  In re C.O., 65
S.W.3d 175, 182 (Tex. App.–Tyler 2001, no pet.). 

            The
State provided expert testimony from Cuellar and Kula who examined M.D. and
diagnosed him with schizoaffective disorder, bipolar type and bipolar disorder,
type I, manic with psychotic features. 
However, expert testimony confirming mental illness, standing alone,
will not support an involuntary commitment. 
T.G. v. State, 7 S.W.3d 248, 252 (Tex. App.–Dallas 1999,
no pet.).  Cuellar reported that M.D.
verbalized nonstop hostile, critical remarks against his wife and
daughter.  Kula stated that M.D. said
that there was nothing wrong with him and that his wife had the problem.  According to Kula, M.D. was hostile and
threatening to the medical staff. 
Further, at trial, Kula testified that M.D. was manic and psychotic as
well as grandiose with persecutory delusions. 
Kula also testified that M.D. claimed that he was being framed and sent
to the Hospital and that he denied having any mental or physical
illnesses.  Evidence of continuing
delusional or paranoid behavior merely reflects that an individual is mentally
ill and in need of hospitalization, but does not provide the continuing pattern
of behavior necessary to support a commitment. 
See In re C.O., 65 S.W.3d at 182; Broussard
v. State, 827 S.W.2d 619, 622 (Tex. App.–Corpus Christi 1992, no writ).


            An
expert opinion recommending commitment must be supported by the factual bases
on which it is grounded and not simply recite the statutory criteria.  See J.M. v. State, 178 S.W.3d
185, 193 (Tex. App.–Houston [1st Dist.] 2005, no pet.).  What is necessary is the expert’s description
of the patient’s specific behaviors on which his or her opinion is based.  See id.  We must examine the record to determine
whether there is clear and convincing evidence showing an overt act or a
continuing pattern of behavior that tended to confirm the likelihood of M.D.
causing serious harm to others or his distress and the deterioration of his
ability to function.  See Tex. Health & Safety Code Ann. § 574.034(d).  Cuellar stated that M.D. threatened to load
his gun and shoot anyone in his way and threatened to shoot his wife and
daughter for standing in his way.  Kula
stated that M.D. said he would shoot anyone who got in his way and threatened
to shoot his wife and daughter.  At
trial, Kula testified that M.D., in the presence of the head nurse and while on
the telephone, threatened to kill his wife and made threats to his wife.  According to Kula, M.D.’s family was
allegedly terrified of him.  Further,
Kula believed M.D. was a clear and present danger because he allegedly loaded a
gun and threatened to kill his wife and daughter.  Even after beginning his medication regime,
M.D. required three emergency medications for threatening behavior towards the
nursing staff.  Kula stated that M.D.
postured in a physical manner and frightened Hospital staff, usually in
circumstances when he was being directed by the staff.  Upon release, M.D. wanted to go straight home
to look up his wife and his daughter.  We
consider M.D.’s threats and his threatening actions to be recent overt acts
that tended to confirm the likelihood of serious harm to others.  See Tex.
Health & Safety Code Ann. § 574.034(d).  We also consider M.D.’s behavior, coupled
with his inability to recognize his mental illness, to be a continuing pattern
of behavior that tended to confirm that M.D. was likely to cause serious harm
to others.  Viewing all the evidence in
the light most favorable to the findings, we conclude a reasonable trier of
fact could have formed a firm belief or conviction that M.D. was likely to
cause serious harm to others.  See Tex. Health & Safety Code Ann. §
574.034(a), (d); In re J.F.C., 96 S.W.3d at 266.  Therefore, the evidence is legally sufficient
to support the trial court’s order.  See
In re J.F.C., 96 S.W.3d at 266. 

            Having
determined that the evidence is legally sufficient to support the order, we
address factual sufficiency and consider all of the evidence, both that in
support of and contrary to the trial court’s findings.  See In re C.H., 89 S.W.3d at
27-29.  Although M.D. denied threatening
his wife and daughter, he did so while remarking “to the point that I would do
anything at all.”  He denied making a
telephone call or loading a rifle and threatening to shoot his immediate
family.  M.D. “guaranteed” that he would
not harm his wife.  The trial court was
entitled to disbelieve M.D. and disregard the evidence contrary to the State’s
position.  See id.  Based upon our review of the record as a
whole, we conclude that, although there is some disputed evidence, this
evidence is not so significant that a reasonable trier of fact could not have
reconciled this evidence in favor of its finding and formed a firm belief or
conviction that M.D. was likely to cause serious harm to others.  See Tex.
Health & Safety Code Ann. § 574.034(a)(d); In re J.F.C.,
96 S.W.3d at 266.  Therefore, the
evidence is factually sufficient to support the trial court’s order.  Id.  Having determined that the evidence is
legally and factually sufficient to support one of the criteria found by the
trial court, we need not consider the additional criteria used to support his
commitment.  See Tex. Health & Safety Code Ann. §
574.034(a); Tex. R. App. P. 47.1.
Accordingly, we conclude that the trial court met the obligations imposed by
Section 574.034 of the Texas Health & Safety Code and overrule M.D.’s sole
issue.

 

 








Disposition

            The judgment
of the trial court is affirmed.

 

                                                                                                    SAM GRIFFITH   

                                                                                                               Justice

 

 

Opinion delivered June 30,
2006.

Panel consisted of Worthen,
C.J. and Griffith, J.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

(PUBLISH)