Opinion issued June 26, 2008











In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00112-CV

NO. 01-08-00113-CV






J.C., Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the Probate Court

Galveston County, Texas

Trial Court Cause Nos. 3264, 3264A






MEMORANDUM OPINION

 In these two accelerated appeals, appellant, J.C., raises three issues challenging
the trial court's orders that J.C. (1) be involuntarily committed for temporary inpatient
mental health services (1) and (2) be administered psychoactive medications. (2)
 J.C. contends
that the evidence presented by the State at her commitment hearing is legally and
factually insufficient to support the findings on which the order for temporary inpatient
treatment is based. She further contends that there is no evidence to support the trial
court's order to administer psychoactive medication.

 We reverse and render.

Background


 After moving to Texas from Florida in late 2007, J.C., a 58-year-old woman,
stopped taking her psychiatric medications and began experiencing delusions that her
husband was trying to poison her. In January 2008, she made repeated phone calls to the
League City police department alleging that her husband was trying to kill her. In early
January 2008, J.C. was seen at the emergency room and released after a psychiatric
consultation. J.C. testified that a police officer, Sgt. Callendar, convinced her to come
voluntarily.

 J.C. said that Sgt. Callendar brought her to the emergency room again about a
week later. At that time, J.C.'s husband told hospital staff that she had threatened his life
and said that she had sent some bikers and thugs to get him. (3) According to the hospital
notes, J.C. also threatened a doctor who was treating her. 

 Dr. Waheedul Haque, who treated her and supervised residents who treated her,
testified that J.C. was suffering from delusional disorder. He testified that her main
delusion is that her husband is trying to hurt, harm, or poison her and that he has already
poisoned her. He said J.C. believed that the hospital staff was working in concert with
her husband, also trying to poison her, and that she, therefore, had refused almost all
medication. Haque said that numerous tests were done, and none showed any evidence
of poisoning. 

 Dr. David Streckman, a resident who also treated J.C., testified that he had
observed paranoid delusional behavior in J.C. For example, he testified that J.C.
suggested that members of the nursing staff were on her husband's payroll and that one
of the patients on the unit was a spy for her husband. Although she later retracted the
statement about the spy, J.C. continued to make statements about the nursing staff being
on her husband's payroll. Streckman testified that J.C. told him that her husband tried
to poison her, initially with low doses of arsenic over a long period of time, but later with
liquid nicotine. 

 Dr. Haque said that he believed J.C. was a danger to herself, citing as an example
that J.C. left home and was "holed up in a motel room somewhere . . . [a]nd even now
she is so afraid that she never plans to go back home and [is] practically making herself
homeless." Dr. Haque testified that J.C.'s extreme fear and worry about people around
her turning on her could lead to retaliatory actions harmful to herself or others. Dr.
Haque said that, although J.C. was aggressive when talking about her husband and
actually chased him out of the ward, she is not generally dangerous to other people. Both
Dr. Haque and Dr. Streckman testified that they did not believe that J.C. could take care
of herself.

 Dr. Haque testified that his diagnosis of delusional disorder, n. o. s. (not otherwise
specified) simply referred to her stage of illness. He opined that J.C. would most likely
end up with a diagnosis of paranoid type delusional disorder. He also said that initial
onset of delusional disorder at J.C.'s age was consistent with the disease. 

 Dr. Haque recommended inpatient treatment in a hospital setting. Initially, he
testified that he had recommended Austin State Hospital in writing because J.C. had
refused to take medication. Because J.C. began taking medication the day before the
hearing, Dr. Haque suggested continued treatment at the Gulf Coast Center, where J.C.
was at the time of the hearing. However, when asked again, Dr. Haque stated that Austin
State Hospital was the "appropriate treatment." Bill Ahearn, mental health liaison for the
Gulf Coast Center, testified that he had reviewed her medical records and that he thought
she would be best treated at the Austin State Hospital. 

 J.C. testified that she thought her husband was trying to poison her. She said:

 I don't think his original plan was to take my life. I believe that his original
plan was to just make me look older and feel older because unfortunately he
is very paranoid, schizophrenic. And he believes that he might lose his
beautiful wife at the age of about 56. At that time I probably looked like I
was about 40; but that's only by the grace of God, nothing that I have done.


 J.C. testified that she does not believe she is mentally ill, but she said she had
started taking her medication "because some of the employees here told me that if I did
not take prescription psychotic medicines that I would never leave these hell holes. I
would remain in them for the rest of my life." She said she had many places she could
go if she were permitted to leave, citing family members and close friends. J.C. testified
that she has three adult children, ranging in age from 33 to 41. None of her children
were present at the hearing. (4) She said one daughter lived in a "nice home" in Katy,
Texas, "[a]nd I know I am welcome there." J.C. also spoke about another daughter who
is a single mother suffering from Crohn's disease. 

 J.C. said she was unemployed, but she could be employed "in a matter of probably
three days if you want me to be." She said she did not believe the doctors who said she
had not been poisoned. J.C. asked the trial court to release her, saying:

 I just need--Your Honor, I have three wonderful children; and I am all
they have. I am all they have. I am their strength. I am their will to go on. 
I am their caretaker if they need it. I always have been. They haven't had
a real father in a long time, and my daughter is very ill. Her Crohn's
disease has been activated because of all this trauma. She is single. She is
poor. She has got two little boys. They are my grandchildren. Please let
me go to her and help her today.


 The court found that J.C. was suffering from a mental illness and as a result of that
mental illness, she was likely to cause serious harm to herself and that she was in such
distress that it made her unable to make a rational and informed decision as to whether
or not to submit to treatment. The trial court ordered her to be committed to the Austin
State Hospital for a period of not longer than 90 days. After an additional, brief hearing,
the trial court ordered the administration of psychoactive medications. J.C. appealed.

Jurisdiction

 The specified term of both orders that J.C. contests was a period not to exceed 90
days, which has expired. However, the doctrine of mootness does not apply to appeals
from involuntary commitments for temporary hospitalization. State v. Lodge, 608
S.W.2d 910, 912 (Tex. 1980). Likewise, we have held that the doctrine of mootness
does not apply to an order to administer psychoactive medication. J.M. v. State, 178
S.W.3d 185, 189-90 (Tex. App.--Houston [1st Dist.] 2005, no pet.) Therefore, we
conclude that we have jurisdiction over this case.


Order for Temporary Commitment

A. Burden of Proof

 In her first two issues, J.C. challenges the legal and factual sufficiency of the
evidence supporting the Order for Temporary Inpatient Mental Health Services.

 "A person may not be deprived of his liberty by a temporary involuntary
commitment unless there is a showing of a substantial threat of future harm to himself
or others." Taylor v. State, 671 S.W.2d 535, 538 (Tex. App.--Houston [1st Dist.] 1983,
no writ). To obtain an order for temporary, involuntary commitment, the State must
meet a two-part test, proving by clear and convincing evidence that (1) the proposed
patient is mentally ill and (2) as a result of that mental illness the proposed patient:

 (A) is likely to cause serious harm to himself;


 (B) is likely to cause serious harm to others; or


 (C) is:


 (i) suffering severe and abnormal mental, emotional, or physical
distress;


 (ii) experiencing substantial mental or physical deterioration of the
proposed patient's ability to function independently, which is
exhibited by the proposed patient's inability, except for reasons of
indigence, to provide for the proposed patient's basic needs,
including food, clothing, health, or safety; and


 (iii) unable to make a rational and informed decision as to whether
or not to submit to treatment.


Tex. Health & Safety Code Ann. § 574.034(a) (Vernon 2003). In ordering temporary
involuntary commitment, the trial court must specify which of the three criteria
prescribed by Subsection (a)(2) forms the basis for its decision. Id. § 574.034(c)
(Vernon 2003). Our review is limited to the criteria actually identified. Johnstone v.
State, 961 S.W.2d 385, 388 (Tex. App.--Houston [1st Dist.] 1997, no pet.). 

 To be clear and convincing, the evidence must include expert testimony and
"evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:
(1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed
patient's distress and the deterioration of the proposed patient's ability to function." 
Tex. Health & Safety Code Ann. § 574.034(d) (Vernon 2003). However, expert
diagnosis alone is not sufficient to confine a patient for compulsory treatment. 
Johnstone, 961 S.W.2d at 388; Mezick v. State, 920 S.W.2d 427, 430 (Tex.
App.--Houston [1st Dist.] 1996, no pet.). The expert opinions and recommendations
must be supported by a showing of the factual bases on which they are grounded. 
Johnstone, 961 S.W.2d at 388; Mezick, 920 S.W.2d at 430. The trial court need not
specify which basis for clear and convincing evidence listed in subsection 574.034(d)
supports its subsection 574.034(a) findings. See M.S. v. State, 137 S.W.3d 131, 135 n.
5 (Tex. App.--Houston [1st Dist.] 2004, no pet.). However the recent overt act or
continuing pattern of behavior proven by the State must relate to the criterion on which
the judgment is based. J.M., 178 S.W.3d at 193.

 We have repeatedly held that evidence of psychotic behavior and refusal to take
medicine cannot, without more, support the statutory requirement for an overt act or a
continuing pattern of behavior. Armstrong v. State, 190 S.W.3d 246, 252-54 (Tex.
App.--Houston [1st Dist.] 2006, no pet.) (holding evidence of mental illness and refusal
to take medications for chronic medical conditions legally insufficient to show that
appellant was harm to herself); J.M., 178 S.W.3d at 195-97 (holding evidence of mental
illness and refusal to cooperate legally insufficient to support involuntary commitment);
M.S., 137 S.W.3d at 137 (holding evidence of appellant's mental illness alone legally
insufficient to support trial court's commitment order); G.H. v. State, 96 S.W.3d 629,
635 (Tex. App.--Houston [1st Dist.] 2002, no pet.) ("mere evidence of a patient's mental
illness and refusal to take medication is not sufficient to sustain the State's statutory
burden"); K.T. v. State, 68 S.W.3d 887, 892 (Tex. App.--Houston [1st Dist.] 2002, no
pet.) ("Evidence that merely reflects that an individual is mentally ill and in need of
hospitalization is no evidence the statutory standard has been met."); Johnstone, 961
S.W.2d at 389-90 (holding evidence of psychotic behavior and refusal to take
medications insufficient).


B. Standard of Review

 Because of the heightened, clear-and-convincing-evidence burden of proof in the
trial court, we apply an elevated standard of review here. J.M., 178 S.W.3d at 190-92. 
We will "look at all the evidence in the light most favorable to the finding to determine
whether a reasonable trier of fact could have formed a firm belief or conviction that its
finding was true." In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). In looking at the
evidence in the light most favorable to the judgment, we assume that "the fact-finder
resolved disputed facts in favor of its finding if a reasonable fact-finder could do so." 
Id. We will "disregard all evidence that a reasonable fact-finder could have disbelieved
or found to have been incredible," though we will not disregard undisputed facts that do
not support the finding. Id.

C. Discussion

 The trial court found that J.C. was mentally ill and (1) likely to cause serious harm
to herself and (2) suffering severe and abnormal mental, emotional or physical distress;
experiencing substantial mental or physical deterioration of her ability to function
independently, which is exhibited by J.C.'s inability, except for reasons of indigence, to
provide for her basic needs, including food, clothing, health, or safety; and; unable to
make a rational and informed decision as to whether or not to submit to treatment. See
Tex. Health & Safety Code Ann. § 574.034(a). 

 J.C. contends that the evidence is legally to support the findings in the trial court's
order because the evidence fails to establish a "recent overt act" or a "continuing pattern
of behavior" for each of the findings. See id. § 574.034(d). Although Dr. Haque
testified that she was "practically making herself homeless" and that her extreme fear and
worry about people around her turning on her could lead to retaliatory actions harmful
to herself or others, he did not provide any factual basis for these conclusions. See
Johnstone, 961 S.W.2d at 388; see Mezick, 920 S.W.2d at 430. Likewise Dr. Haque's
and Dr. Streckman's opinions that J.C. could not care for herself were unsupported by
any factual basis. For example, there was no evidence that J.C. was unable to provide
for her basic needs.

 As in the cases cited above, the evidence here establishes only that J.C. is mentally
ill and refused medication until the day before her hearing. This does not satisfy the
statutory requirement of an overt act or a continuing pattern of behavior. Therefore, the
evidence is legally insufficient to support the trial court's findings.

 We sustain J.C.'s first issue. Because we sustain J.C.'s first issue, we need not
address her second issue, the factual sufficiency of the evidence to support the trial
court's order.



Order to Administer Medication

 In her third issue, J.C. challenges the sufficiency of the evidence to support the
trial court's order to administer psychoactive medication. A trial court may issue an
order authorizing the administration of psychoactive medications only if the proposed
patient is under an order for involuntary mental health services. Tex. Health & Safety
Code Ann. § 574.106(a)(1) (Vernon Supp. 2007). Because we reverse the trial court's
order of commitment, we must also reverse its order to administer psychoactive
medications. See G.H., 96 S.W.3d at 635.

 We sustain appellant's third issue.

Conclusion

 We reverse the orders of the trial court, and we render judgment denying the
State's applications to commit appellant for court-ordered temporary mental health
services and to administer psychoactive medications to her.





 Sam Nuchia

 Justice


Panel consists of Justices Nuchia, Alcala, and Hanks.
1. Trial court cause no. 3264; appellate cause number 01-08-00112-CV
.
2. Trial court cause no. 3264A; appellate cause number 01-08-00113-CV.

3. The hospital notes recite, "Per husband, Pt has been making threats on his life, saying that she's
sent some bikers/thugs out to get him, and that he'd better be careful. Husband states that she has
access to weapons, and he is concerned about the safety of his friends and family."
4. When asked if her children were at the hearing, J.C. responded, "A lot of people in this room. 
I don't see them."