

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-14-00398-CV

IN THE MATTER OF J.M.

----------

FROM THE PROBATE COURT OF DENTON COUNTY
TRIAL COURT NO. MH-2014-715

----------

## MEMORANDUM OPINION[1]

----------

Appellant J.M. appeals from a judgment for temporary court-ordered inpatient mental health services. In a single issue, J.M. challenges the legal sufficiency of the evidence to support the trial court's findings. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## I. Background

J.M. suffers from bipolar disorder and has received inpatient treatment on four prior occasions. She was discharged from the North Texas State Hospital (NTSH) on November 21, 2014. On November 24, 2014, a peace officer with the Denton County Sheriff's Office, believing J.M. was mentally ill, took J.M. into custody without a warrant and transported her to Mayhill Hospital in Denton, Texas. *See* Tex. Health & Safety Code Ann. §§ 573.001–.026 (West 2010 & Supp. 2014) (providing procedures for emergency detention for cases of suspected mental illness). In his notification of detention, the officer stated that he believed that J.M. was mentally ill and that there was imminent risk that she would seriously harm herself or others based upon a report from the Denton County Mental Health Mental Retardation Lewisville outpatient clinic that since J.M.'s release from NTSH, she had become verbally and physically aggressive towards her elderly parents, had been leaving her residence in her pajamas and wearing no shoes, had been receiving car rides from strangers, and had been walking into traffic. *See id.* § 573.002.

On November 25, 2014, Ashley Rigsby, LPC, a mental health professional at Mayhill Hospital, filed a sworn application for temporary court-ordered mental health services, alleging that J.M. was mentally ill and as a result of that mental illness (1) was likely to cause serious harm to herself, (2) was likely to cause serious harm to others, and (3) was suffering from severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical

2

deterioration of her ability to function independently, which was exhibited by J.M.'s inability, except for reasons of indigence, to provide for her basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See id.* §§ 574.001 (West 2010), .002 (West Supp. 2014). According to Rigsby's affidavit filed in support of the application, J.M. was at risk of serious harm to herself or others because of her physical aggression towards her elderly parents, her engagement in reckless behavior such as playing in the street and accepting rides from strangers, and her psychotic and paranoid thought processes, which included J.M.'s belief that her dog and people were watching her.

Also on November 25, 2014, Dr. Asad Islam, M.D. filed a sworn certificate of medical examination for mental illness. *See id.* § 574.009 (West 2010). Dr. Islam averred that he examined J.M. on November 24, 2014, at Mayhill Hospital and diagnosed her with bipolar disorder, most recent episode mixed with psychosis. Dr. Islam believed that as a result of her illness, J.M. was (1) was likely to cause serious harm to herself, (2) was likely to cause serious harm to others, and (3) was suffering from severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of her ability to function independently, which was exhibited by J.M.'s inability, except for reasons of indigence, to provide for her basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See id.* § 574.011(a)(7)

3

(West 2010).  He based this opinion on J.M.'s physical aggression towards her elderly parents, her wandering from her home and into traffic, her accepting rides from strangers, and her reported auditory and visual hallucinations.  He stated that he believed that J.M. presented a substantial risk of serious harm to herself or others if not immediately restrained based on her behavior and "by evidence of severe emotional distress and deterioration in [her] mental condition to the extent that [she] cannot remain at liberty."  He recommended inpatient hospitalization and noted that her condition had been deteriorating since her release from NTSH on November 21, 2014.

The State filed a motion for an order of protective custody of J.M. pending resolution of the case, and the trial court granted it.  *See id.* § 574.021 (West 2010).  The trial court appointed counsel to represent J.M., set dates for a probable cause hearing and the application hearing, and issued notice to J.M.  *See id.* §§ 574.003, .005–.006, .025 (West 2010).  At the probable cause hearing on November 25, 2014, the hearing officer determined that there was probable cause to believe that J.M. presented a substantial risk of serious harm to herself or others such that she could not be at liberty pending the final hearing and ordered that she be detained at NTSH.  *See id.* § 574.025.

On November 26, 2014, Dr. Peter George Fadow, M.D. filed a sworn certificate of medical examination for mental illness.  *See id.* § 574.009.  Dr. Fadow stated that he examined J.M. on November 25, 2014, at NTSH and diagnosed her with bipolar I disorder, most recent episode mixed severe with

4

psychotic features. Like Dr. Islam, Dr. Fadow believed that as a result of her illness, J.M. (1) was likely to cause serious harm to herself, (2) was likely to cause serious harm to others, and (3) was suffering from severe and abnormal mental, emotional, or physical distress; experiencing substantial mental or physical deterioration of her ability to function independently, which was exhibited by J.M.'s inability, except for reasons of indigence, to provide for her basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See id.* § 574.011(a)(7). Dr. Fadow reported that since J.M.'s release from NTSH on November 21, 2014, she had not been cooperating with outpatient care or taking her mediations, and according to her family, she had been abusing drugs. He also stated that she had been violent towards NTSH staff and required emergency medication and restraints to prevent continued violence. J.M. admitted to Dr. Fadow to making threats to kill herself by running into traffic. Dr. Fadow recommended that J.M. be temporarily committed to NTSH.

At the December 8, 2014 hearing on the application for temporary mental health services, J.M. and Dr. James D. Shupe, M.D., an expert in the field of forensic psychiatry who had examined J.M., testified. The trial court found that J.M. was mentally ill and that as a result of her mental illness, J.M. (1) is likely to cause serious harm to herself; (2) is likely to cause serious harm to others; and (3) will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress and will continue to experience deterioration of her ability to

5

function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment. The trial court granted the State's application and ordered J.M. committed to NTSH for a period not to exceed ninety days. J.M. appealed.

## II. Analysis

In her sole issue, J.M. argues that the State failed to prove by clear and convincing evidence that (1) she is likely to cause serious harm to herself or others or (2) is suffering severe and abnormal mental, emotional, or physical distress and will continue to experience deterioration of her ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment because the State failed to present specific evidence of a recent overt act or continuing pattern of behavior under health and safety code section 574.034(d). *See id.* § 574.034(a)(2), (d) (West Supp. 2014).

### A. Health and Safety Code Section 574.034

A court may order a proposed patient to receive temporary inpatient mental health services only if the factfinder concludes from clear and convincing evidence that the proposed patient is mentally ill and also meets at least one of the additional criteria set forth in section 574.034(a)(2):

(2)     as a result of that mental illness the proposed patient:

(A)     is likely to cause serious harm to himself;

(B)     is likely to cause serious harm to others; or

(C)     is:

6

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

*Id.* § 574.034(a). Here, the trial court found that J.M. is mentally ill, which she does not challenge on appeal. In addition, the trial court found each of the State's allegations under subsection (2) to be true.

## B. The State's Burden

The evidentiary standards for involuntary commitment are high. *State ex rel. E.E.*, 224 S.W.3d 791, 794 (Tex. App.—Texarkana 2007, no pet.) (citing *Harris v. State*, 615 S.W.2d 330, 333 (Tex. Civ. App.—Fort Worth 1981, writ ref'd n.r.e.)). The State has the burden of establishing by clear and convincing evidence that the proposed patient meets at least one of the additional criteria listed in section 574.034(a)(2). *Mezick v. State*, 920 S.W.2d 427, 430 (Tex. App.—Houston [1st Dist.] 1996, no writ). Clear and convincing evidence is that "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

7

As a general rule, when court-ordered temporary mental health services are sought under subsection (a), specific requirements for clear and convincing evidence are imposed:  the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:  (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.  Tex. Health & Safety Code Ann. § 574.034(d).  An expert diagnosis of mental illness, without more, is not sufficient to confine a patient for compulsory treatment.  *Mezick*, 920 S.W.2d at 430.  The State cannot meet its burden of proof without presenting evidence of the behavior of the proposed patient that provides the factual basis for the expert opinion.  *See id.*  Moreover, the recent overt act or continuing pattern of behavior shown by the State must also relate to the criterion on which the judgment is based.  *J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

## C.  Standard of Review

To review the legal sufficiency of the evidence where the burden of proof is clear and convincing evidence, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its findings were true.  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we

8

must disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.*

## D. Sufficiency of the Evidence

First, J.M. contends that the State failed to show by clear and convincing evidence that she is likely to cause serious harm to herself or others. *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(A), (B). In order to meet its evidentiary burden, the State was required to bring forth expert testimony of either a recent overt act or a continuing pattern of behavior that tends to confirm the likelihood of serious harm to the proposed patient or others. *See id.* § 574.034(d)(1); *see also J.M.*, 178 S.W.3d at 193 ("[T]he recent overt act or continuing pattern of behavior proven by the State must relate to the criterion on which the judgment is based."). While the trial court took judicial notice of the application for temporary mental health services and the certificates of medical examination filed by Dr. Islam and Dr. Fadow, it could not take judicial notice of the truth of any allegations contained in those documents. *See State ex rel. K.H.*, No. 02-02-00301-CV, 2003 WL 21404821, at *2 (Tex. App.—Fort Worth June 19, 2003, no pet.) (mem. op.). Therefore, we may consider only the evidence presented at the hearing. *See id.*

During the hearing, Dr. Shupe, the State's expert witness, testified that he examined J.M. the day of the hearing and at least once before. The purpose of his examination on the day of the hearing was to determine whether J.M. needed to remain at NTSH and to talk with her about her desire to remain there. During

9

his examination, Dr. Shupe observed that J.M. was cooperative and pleasant, but she wanted to go home. He also learned that J.M. did not believe that she needed to remain hospitalized and thought that everything would be fine if she were released.

Based upon his examination of J.M., Dr. Shupe diagnosed J.M. with bipolar disorder and recommended continued court-ordered inpatient treatment. Dr. Shupe testified that J.M. was likely to cause harm to herself and others. He further testified that a couple of days after J.M. was released from NTSH on November 21, 2014, she was walking out into traffic and was aggressive towards her elderly parents. On cross-examination, Dr. Shupe stated that based upon his examination, he did not believe that J.M. was suicidal. However, he thought her lack of judgment and impulse control would put her into dangerous situations because she still did not seem to understand how dangerous her behavior was or why she was hospitalized again, which made Dr. Shupe worry that she would do the same things again.

When asked why she was admitted to NTSH, J.M. responded, "Because I was walking around in the street. I was walking barefoot outside and I was just — I was walking to my aunt's house. Being overly aggressive with my mother." J.M. further testified that she punched her mother in the shoulder. J.M. understood the difference between inpatient and outpatient treatment and preferred the latter. She thought she could be "very successful" in attending outpatient treatment and asked the trial court to order outpatient treatment.

J.M. argues that Dr. Shupe's testimony alone is insufficient to establish clear and convincing evidence because his testimony regarding J.M.'s likeliness to cause harm to herself or others was conclusory. With respect to the trial court's finding under section 574.034(a)(2)(A), J.M. argues that the State did not present sufficient evidence to establish that J.M. was a *serious* harm to herself because (1) Dr. Shupe testified J.M. was not suicidal; (2) Dr. Shupe had no knowledge as to the severity of the incident where J.M. walked into traffic; (3) J.M. testified she was merely "walking around in the street"; and (4) there was no evidence of the traffic conditions, whether the roadway was dangerous, or J.M.'s proximity to oncoming traffic, if any.

Vehicular traffic, by its very nature, poses a danger to pedestrians. Even though J.M. was not suicidal, walking out into traffic is an overt act that tends to confirm the likelihood that J.M. was a serious harm to herself. *See State ex rel. D.D.*, No. 12-12-00220-CV, 2013 WL 3486991, at \*3 (Tex. App.—Tyler July 10, 2013, no pet.) (mem. op.) (stating that even in the absence of attempted suicide, walking in front of traffic was an overt act tending to confirm the likelihood of serious harm to oneself); *see also State ex rel. L.S.G.*, No. 12-04-00240-CV, 2005 WL 737038, at \*4 (Tex. App.—Tyler 2005, no pet.) (mem. op.) (stating that walking into oncoming traffic is a recent overt act that tends to confirm the likelihood of serious harm to oneself). J.M. characterized the incident as "walking around in the street," but the trial court could have reasonably resolved this disputed evidence in favor of its finding because Dr. Shupe testified that J.M.

11

lacked judgment and impulse control and did not seem to understand how dangerous her behavior could be. Viewing the evidence in the light most favorable to the finding, we conclude that the trial court could have formed a firm conviction or belief that J.M. is likely to cause serious harm to herself. *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(A), (d)(1). Because we have held the evidence is legally sufficient to support the trial court's finding under section 574.034(a)(2)(A) and because only one subsection under section 574.034(a)(2) is needed to support a temporary commitment, we need not determine whether the evidence is also legally sufficient to support the trial court's findings under subsections 574.034(a)(2)(B) or (C). *See id.* § 574.034(a)(2); *In re P.O.C.*, No. 02-13-00263-CV, 2013 WL 5517889, at *5 & n.5 (Tex. App.—Fort Worth Oct. 3, 2013, no pet.) (mem. op.) (noting that only one statutory criterion must be met under section 574.034(a)(2) to form the basis for judgment for temporary court-ordered inpatient mental health services and affirming judgment where evidence was sufficient to support finding that proposed patient was likely to cause serious harm to himself); *see also* Tex. R. App. P. 47.1 (stating that appellate court need only address every issue necessary to final disposition of appeal). Accordingly, we overrule J.M.'s sole issue.

### III. Conclusion

Having overruled J.M.'s sole issue, we affirm the trial court's judgment for temporary court-ordered inpatient mental health services.

PER CURIAM

PANEL:  GARDNER, WALKER, and GABRIEL, JJ.

DELIVERED:  February 12, 2015