# NO. 12-17-00310-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *THE STATE OF TEXAS FOR THE* | § | *APPEAL FROM THE* |
| *BEST INTEREST AND PROTECTION* | § | *COUNTY COURT AT LAW* |
| *OF G. H.,* | § | *CHEROKEE COUNTY, TEXAS* |

## MEMORANDUM OPINION

G.H. appeals from an order for temporary inpatient mental health services. In his sole issue, G.H. challenges the legal and factual sufficiency of the evidence to support the trial court's order. We reverse and render.

## BACKGROUND

On September 19, 2017, Steve Peters with Skyview Psychiatric Facility, where G.H. was a patient, filed an application for court ordered temporary mental health services. In a team member letter, Peters stated that G.H.'s records show that he sees demons daily, refused to take Risperdal medication orally, claimed there were chemicals in his food and plastic under his skin, wanted to restrict his records to be shared with only "God loving individuals," wanted to go home so he could go to church, and prefers to take vitamins and receive oil for his skin. Peters stated that:

> Records indicate that the patient remains hyper-religious with numerous delusions, and no plans to seek treatment for mental health in the freeworld. He also adamantly opposes going to a psychiatric facility and insist[s] that he does not need to take psychotropic medications but instead needs vitamins and Holy water.

According to Peters, it appears that G.H. received treatment from a psychiatric hospital from August 3, 2016 through February 22, 2017 and has been under the care of Harris County

MHMR. He stated that G.H.'s mother supported G.H., but was in agreement that he go to the hospital for further treatment. Peters explained that G.H. is unstable and the treatment team recommended that he continue treatment at Rusk State Hospital upon his release from Skyview.

In a physician's certificate, Dr. Andrey Tsyss, who evaluated G.H. on September 15, 2017 at Skyview, identified G.H.'s diagnosis as schizoaffective disorder unspecified. He stated that G.H. is mentally ill and suffers from severe and abnormal mental, emotional or physical distress, experienced substantial mental or physical deterioration of his ability to function independently, as exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety, and, is unable to make a rational and informed decision as to whether or not to submit to treatment. To support this conclusion, Tsyss identified the following statements by G.H.:

There have been times when I was fasting.
They [demons] don't like me.
All that medications are wrong.
No. My mind is not ill [when asked if he believes that he has a mental illness].
He would rather take holy water than a pill.
On 7/31/17 stated, "there is a liner under my skin … I don't need pills. I need healing water … Demonic entities are trying to spread sperm in my genitals up to my head … There is a cavity in my head, plastic pieces. I need to get it out."
On 7/31/17 stated that he sees demons on a daily basis.

Tsyss further explained that G.H. (1) refused to take antipsychotic medication, Risperdal, orally; (2) claimed there are chemicals in the food and plastic under his skin; (3) said he would take holy water rather than pills; and (4) denied having a mental illness or needing antipsychotic medication.

In another physician's certificate, Dr. Stacey R. Belcher stated that G.H. has been under her care since he arrived at Skyview on July 18, 2017. She identified G.H.'s diagnosis as schizoaffective disorder and stated that he (1) suffers from severe and abnormal mental, emotional or physical distress, (2) experiences substantial mental or physical deterioration of his ability to function independently, which is exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety, and (3) is unable to make a rational and informed decision as to whether or not to submit to treatment. She identified the following as a basis for this opinion:

2

During an interview, G.H. was guarded and repeatedly responded to questions with "I'd rather not speak about that" and "I don't want to share that."

G.H. stated that he was "trying to restrict my records to be shared with only God-loving individuals" and wanted "to go home and go to church."

G.H. was "trying to get off the Risperdal," said that he prefers to take "a vitamin for health" and "oil for my skin." He claimed, "the doctor told me it is an oil of gladness."

When asked about the "demonic entities," G.H. initially refused to share the information, but later stated, "Emily, she's from 1841. She came around at the other unit and came over here with me … I don't know if it is her or someone else who came over here with her." He claimed that Emily does not intend to do bad things but that bad things happen.

G.H. said he does not plan to follow-up with mental health treatment upon his release, but will immerse himself in church where he can "get with the saints."

G.H. claimed, "What I experience is not abnormal … I'm not unstable. I may not be where I need to be but I'm able to work."

G.H. reported having an "inability to feel lasting joy, pleasantness."

Per a July 13, 2017 evaluation, G.H. stated, "pharmaceuticals don't help. I need God to help me. God's children aren't supposed to be on drugs." He admitted that he will not take any medication. He is definitely hyper-religious in thought and preoccupied with the super natural. He stated, "I don't know why I need to answer these questions. I'm not the same person that l was."

A July 14 referral note states: "Reason for Transfer: Patient is hyper-religious, quoting scripture and has delusions about the supernatural, "good and evil" that surround him. He spoke of having "a TV coming out of his mouth this morning, along with plastics and rubbers." He stated that he does not eat sometimes because of what is in the food, like plastics. He reported that a plastic liner is inside him with water that was placed there, but it is fragile and can break. Patient admitted that he is having difficulty in his dorm. He is refusing his medication because "in the Bible [it] says for me to stay sober."

On or about September 21, G.H. sent a written request that read, "I am ASKING you: Make this so soon please: Please: by the name of THE GOD OF LOVE - I AM asking you to not allow anybody to send me to mental health court to try to [send] me to another hospital. I was Granted Parole (was served the paper yesterday), and it is my Right whom I choose to receive my HELP from… AND I CHOOSE to Go to THE CHURCH OF CHRIST and walk with Saints. A doctor spoke with me today. I do not want any of my records being rev[i]ewed or accessed, by non-Believers anymore - in any way. Please [send] me Home[.]" The patient was seen on 9/21 by his therapist to address the written request and she documented, "He was informed that the treatment staff had access to records as needed to provide the best care for him possible and the decisions to recommend him for civil commitment would be made by the provider. He was upset this was being considered and stated, "But Miss, I am not sick. I just need the healing waters. Please. Don't send me to the hospital." This writer attempted to remind him about the previous reports he was making before he was compelled to take medication and he stated, "Talking about those things got me the wrong help. I can't talk to you about those things, only other people who should be involved in my treatment.""

According to Belcher, G.H. has a history of schizoaffective disorder bipolar type and substance abuse, and was required to attend outpatient substance abuse treatment as part of probation/parole requirements. She stated that he required inpatient psychiatric hospitalization both in the free world and during previous and current incarcerations. When he left TDCJ in May 2015, he required civil commitment. When he returned to TDCJ to serve a sentence for evading arrest or detention with a motor vehicle, he was prescribed an antipsychotic and an antidepressant for schizoaffective disorder. Upon his arrival at the intake unit, G.H. appeared

psychotic and denied a need for mental health treatment; thus, he was referred to Skyview and was admitted for treatment on July 20, 2017. He refused psychotropic medications and laboratory tests, and voiced "bizarre delusions about being 'synthetic' and having plastics in his body." After a hearing on August 14, he required compelled medications. Belcher stated that:

> He remains hyper-religious with numerous delusions and no plans to pursue [mental health] treatment in the free world. He is adamantly opposed to going to a psychiatric facility and insists that he should not take psychotropic medications but, instead, needs a vitamin and holy water. Insight and judgment are considered highly impaired. He appears at risk of further deterioration in his ability to provide for his basic needs if not sent to an inpatient psychiatric hospital upon release.

After a hearing, the trial court signed an order for temporary in-patient mental health services. The trial court found the allegations in the application and physician certificates to be true and correct and supported by clear and convincing evidence that (1) G.H. is mentally ill; and (2) as a result of that mental illness, G.H. will, if not treated, continue to suffer severe and abnormal mental, emotional or physical distress and will continue to experience deterioration of his ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment. The trial court ordered that G.H. be committed to Rusk State Hospital or any other designated facility for in patient care. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In his sole issue, G.H. contends that the evidence is legally and factually insufficient to support the trial court's order because, according to G.H., the "State did not present evidence that a recent overt act or pattern of behavior would indicate G.H. is unable to care for himself."

### Standard of Review

In a legal sufficiency review where the burden of proof is clear and convincing evidence, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*. This does not mean that

4

we are required to ignore all evidence not supporting the finding because that might bias a clear and convincing analysis. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, we consider all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27–29. Further, we must consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If the disputed evidence is so significant that a fact finder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id*.

**Temporary Inpatient Commitment Order**

A trial judge may order a proposed patient to receive court ordered temporary inpatient mental health services only if the judge finds, from clear and convincing evidence, that the proposed patient is a person with mental illness, and, as a result of that mental illness, he is likely to cause serious harm to himself, is likely to cause serious harm to others, or is (i) suffering severe and abnormal mental, emotional, or physical distress, (ii) experiencing substantial mental or physical deterioration of his ability to function independently, which is exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety, and (iii) unable to make a rational and informed decision as to whether or not to submit to treatment. TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (West Supp. 2017).

"Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). To be clear and convincing, the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm either the likelihood of serious harm to the proposed patient or others, or the proposed patient's distress and the deterioration of his ability to function. TEX. HEALTH & SAFETY CODE ANN. § 574.034(d). The statutory requirements for an involuntary commitment are strict because it is a drastic measure. *In re C.O.*, 65 S.W.3d 175, 182 (Tex. App.—Tyler 2001, no pet.).

**Analysis**

Expert testimony confirming mental illness, standing alone, will not support an involuntary commitment. *In re B.A.*, No. 12-16-00183-CV, 2016 WL 4628106, at *3 (Tex. App.—Tyler Sept. 7, 2016, no pet.) (mem. op.); *see T.G. v. State*, 7 S.W.3d 248, 252 (Tex. App.—Dallas 1999, no pet.). Evidence of continuing delusional behavior, hostile behavior, psychotic behavior, provocative statements to others, or paranoid behavior merely reflects that an individual is mentally ill and in need of hospitalization, but does not provide the overt act or continuing pattern of behavior necessary to support a commitment. *In re B.A.*, 2016 WL 4628106, at *3; *see In re C.O.*, 65 S.W.3d at 182; *Broussard v. State*, 827 S.W.2d 619, 622 (Tex. App.—Corpus Christi 1992, no writ). An expert opinion recommending commitment must be supported by the factual bases on which it is grounded and not simply recite the statutory criteria. *In re B.A.*, 2016 WL 4628106, at *3; *see J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App—Houston [1st Dist.] 2005, no pet). What is necessary is the expert's description of the patient's specific behaviors on which the expert's opinion is based. *In re B.A.*, 2016 WL 4628106, at *3; *see J.M.*, 178 S.W.3d at 193. Accordingly, we must examine the record to determine whether there is clear and convincing evidence showing a recent overt act or a continuing pattern of behavior that tends to confirm the likelihood of serious harm to G.H. or others, or of his distress and the deterioration of his ability to function. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(d).

In doing so, we first note that, at the hearing on Peters's application, the two physicians certificates were admitted into evidence. Nothing in the Texas Health and Safety Code authorizes a trial court to base its findings solely on the physicians' certificates. *See id*. §§ 574.031-.037 (West 2017 & Supp. 2017); *In re B.A.*, 2016 WL 4628106, at *2. Pleadings, such as the application, are also not evidence that the statutory standard has been met. *In re B.A.*, 2016 WL 4628106, at *2; *see* TEX. HEALTH & SAFETY CODE ANN. § 574.031 (West 2017) (stating that the Texas Rules of Evidence apply to the hearing for court ordered mental health services unless the rules are inconsistent with the subtitle); *In re E.T.*, 137 S.W.3d 698, 700 (Tex. App.—San Antonio 2004, no pet.); *see also Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995) (noting that, generally, pleadings are not competent evidence, even if sworn or verified).

Regarding the expert testimony, at the hearing, Dr. Belcher testified to examining G.H. at Skyview on September 19, 2017. She testified to diagnosing him with schizoaffective disorder, bipolar type. Dr. Belcher believed that G.H. (1) suffered from severe and abnormal mental, emotional or physical distress; (2) experienced substantial mental or physical deterioration of his ability to function independently, exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health and safety; and (3) is unable to make a rational and informed decision as to whether to submit to treatment. When asked whether an overt act or pattern of behavior contributed to these conclusions, she responded with a "pattern of behavior." Belcher explained as follows:

> …He has a -- a pretty long history of mental health problems. During a previous incarceration he required inpatient admission and non-emergency compelled medications, and then he returned to the system -- TDCJ in July and was promptly referred back to an inpatient psychiatric facility, which was Skyview, because he was very, very delusional, hyperreligious, some paranoia. He did not feel that he needed psychotropic medications because he feels that God can just heal him without -- with just holy water, et cetera. It's a long history of delusional symptoms that the Treatment Team felt strongly that he was unable to do well in – without hospitalization.
>
> …
>
> …He remains hyperreligious with, again, the beliefs that God can just heal him through -- through touch. He's still hearing some voices of people he called spirits. One was Emily from 1841. Many of the questions I tried to ask about based on the chart, he would not -- he wouldn't open up. He's very, very guarded, did not want to share that information because he was -- he didn't want the Court to know about it, repeatedly did that, made those comments that he'd rather not share that information, wanted his records only to be shared with God-loving individuals, and he'd been wanting to get off the medication. He was under a -- we did the compelled medications on him while -- during this admission in August I believe because he would not take the oral medications. He's been on an injection which has been somewhat helpful, but he's been trying to get off the medication, thinking he just needs a vitamin and holy water or anointing oil.

Belcher believed temporary commitment to be both in G.H.'s best interest and the least restrictive available treatment option. She testified that he would be released as soon as medically appropriate.

Belcher also testified that G.H. did not initially bathe regularly or dress himself appropriately, but she believed him to be doing so as of the hearing date. She testified that he has had fights with other inmates in the past, but was now "doing okay." When asked if his condition indicated an inability to care for his basic needs outside the hospital, Belcher responded:

7

I'll be honest, I struggled with this case. I didn't want to step on his religious beliefs and rights. I spoke at length to -- well, the other psychiatrist who visited with him, Dr. Tsyss, felt that he should go to the hospital because of it. I spoke to his provider who actually happens to be a minister, and he -- that provider felt like his beliefs were out in left field basically, were -- were just too extreme. His therapist -- numerous staff members really felt strongly that he needed to go to the hospital, and I can certainly see why. I think the biggest concern is that he's going to stop the medications, get involved with some church somewhere and they might take advantage of him, but more importantly, he's going to deteriorate to a point. He thought that he had plastic in his skin and his body, and, again, he wouldn't share this information in the community because he was -- he didn't want it to be too incriminating. So it's more -- more going based on the potential for decompensation and deterioration without the medications –

…

So for a very brief period of time I think he'd probably be all right, for a week or two, but then I fear that he would decompensate further.

…

We feel that the mental illness -- that the delusion -- that the religious delusions are that, religious delusions, and that he has such poor insight that he's not getting the whole picture, and so we feel that it -- that these are stronger than just simple religious beliefs. They're all part of the -- a delusional process.

…

For a very brief period of time I think he'll be all right outside the hospital. Other than that, I can't say.

G.H. testified that he does not want to go to the hospital. He explained that he has "no over-religious belief[]" and that he "believe[s] what the Bible says[.]" When asked about whether he wants to take psychotropic medication, G.H. stated:

…I'm in sync, in tune with my body. I know how I feel, and if something's helping me, I'm going to say it's helping me, but when I took the medications, the potential of my comprehension and cognitive function was hindered along with some side effects of some nausea -- wavering nausea, come and go, and discontentment and restlessness which is – it's important to feel happy, content and enjoy the moments of life, and when a medication takes that from you, it -- it affects your overall perspective and wellbeing.

…

The Bible says to be sober and be vigilant, and when I'm taking a medication that's a sedative that hindered my ability to do so and I'm not able to respond to life as correctly as I need to, I don't think God wants his children to be sedated.

He testified that he dresses himself and bathes daily. He believed he could care for his needs, and testified that he has remodeling experience that would enable him to provide for himself and his family. The following conversation then occurred:

G.H.'s Counsel: Do you -- now, do -- do you recognize that not everybody thinks the way you necessarily do about demonic entities and things like that?
G.H.: Yes, sir. And just for the record, I want y'all to know that it proves that I am rational because I came to a place and spoke with doctors who handle abnormal -- abnormalities, and I spoke to them in confidence, in privacy, but also to the point I raised -- I raised a question as to

would they be able to help me. So it proves that, you know, I'm not inable (sic) to try to seek for help or that I'm not rational enough to try to ask because none -- none of the issues that are -- that have bothered me I -- I don't want to speak about. I did not want to speak about…

G.H. testified that he would reside with his mother if released, would not become a problem, planned to obtain a job, and his mother would provide groceries until he could get on his feet.

On cross-examination, G.H. initially declined to answer questions about having substances in his body, but then explained that "It was … when I took a shower … it was like the texture of my skin, and the only way that I could -- the way I explained it is the only way that my mind could rationalize the possibility, and not that it was -- you know, the ideology was true or not -- or, was correct or not, I don't know[.]" He elaborated that "it was just like -- it was an element of a type of plastic. I mean, that's – that's just what it felt like. That's the only feeling I could -- I could describe it as." He denied getting into fights or claiming that he had a television coming out of his mouth. When asked about the healing waters and oils he wanted to use, G.H. stated:

> Well, Christ said he was the living waters, and Isaiah 55 says, you know, come to Him in -- in body and purchase bread and -- and milk and wine without -- without cost. So I know that I need to be restored of, you know, and refreshed by the Lord. So that's what I was asking for, and I heard that Dr. Hardy was a Christian and I asked for some oil to -- for the health of my skin, and he said that there was an oil capsule and he said it's kind of like an oil of joy, and I said the oil of gladness -- … and he said yes.

Regarding "Emily," G.H. testified that he has heard her speak to him, most recently a couple days before the hearing. He explained that "Emily … she's an unclean spirit. You know, she cusses sometimes. She does wrong, -- … there's just spirits, there's unclean spirits, there's demonic spirits." He testified that he is not bothered when she speaks to him and that it does not hinder his ability to rationalize or "be effective socially[.]"

Our review of the record demonstrates that the State proved nothing more than that G.H. is mentally ill and in need of hospitalization, which is insufficient to satisfy the statutory standard. *See In re C.O.*, 65 S.W.3d at 181. Dr. Belcher's testimony offers no specific evidence that G.H. posed a substantial threat of harm to himself or others, or that he demonstrated any actual dangerous behavior manifested by some overt act or threats in the recent past. *See In re B.A.*, 2016 WL 4628106, at *3; *see also In re C.O.*, 65 S.W.3d at 181-82. Nor did Dr. Belcher offer any specific evidence of an overt act or a continuing pattern of behavior that would

generally affect G.H.'s ability to function independently on a daily basis without the imposition of mental health services. *See In re B.A.*, 2016 WL 4628106, at *3. G.H.'s refusal to take his medications or his desire to share his records with only certain people is legally insufficient evidence of an overt act or a continuing pattern of behavior that demonstrates either distress or a deterioration of his ability to function. *See id.*; *see also State ex rel. E.R.*, 287 S.W.3d 297, 304 (Tex. App.—Texarkana 2009, no pet.) (patient's refusal to communicate with hospital staff is insufficient to support finding required to authorize court-ordered mental health services). G.H.'s previous hospitalizations are likewise insufficient to demonstrate that commitment is justified in the present case. *See Armstrong v. State*, 190 S.W.3d 246, 252 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Regarding G.H.'s ability to provide for his basic needs, including food, clothing, health, or safety, Dr. Belcher testified that he was currently dressing and bathing himself and that she believed he would be alright in the free world, at least for a brief time, but she admitted "[o]ther than that, I can't say." *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(C)(ii). Belcher's concerns that G.H. would deteriorate "to a point" do not constitute sufficient evidence of an overt act or continuing pattern of behavior tending to confirm G.H.'s distress or a deterioration of the ability to function. *See E.R.*, 287 S.W.3d at 306 ("evidence that the proposed patient will experience substantial mental or physical deterioration in the future does not establish this element[]"); *see also Armstrong*, 190 S.W.3d at 252 (poor grooming or hygiene and "oppositional behavior" do not alone give rise to an overt act or pattern of behavior that confirms a substantial deterioration of a person's ability to function independently or provide for basic needs). Nor does the record suggest that G.H. at any time suffered adverse health effects as a result of failing to provide for his basic needs. *See E.R.*, 287 S.W.3d at 304-05; *see also Armstrong*, 190 S.W.3d at 252. Additionally, the State must show more than G.H.'s delusions, such as those related to demons, or other facts, such as his "extreme" religious beliefs, which merely confirm G.H.'s mental illness and need for hospitalization, to meet the evidentiary standard for a temporary commitment. *See In re B.A.*, 2016 WL 4628106, at *3; *see also In re C.O.*, 65 S.W.3d at 182; *Broussard*, 827 S.W.2d at 622.

Because Dr. Belcher's opinions were not supported by a factual basis or by a description of specific behaviors on which her opinions about G.H. were based, we cannot say that her opinions would lead a reasonable trier of fact to form a firm belief or conviction that G.H.

engaged in a recent overt act or a continuing pattern of behavior that tends to confirm either the likelihood of serious harm to G.H. or others, or G.H.'s distress and the deterioration of his ability to function. *See* Tex. Health & Safety Code Ann. § 574.034(d). Thus, viewing the evidence in the light most favorable to the trial court's findings, we conclude that the evidence is legally insufficient to support the trial court's finding based upon section 574.034(d) of the Texas Health and Safety Code. *See id*.; *see also In re B.A.*, 2016 WL 4628106, at *4. We sustain G.H.'s sole issue.[1]

## DISPOSITION

Having determined that the evidence is legally insufficient to support the trial court's order for temporary inpatient mental health services, we *reverse* the trial court's order for temporary inpatient mental health services, and *render* judgment denying the State's application for court ordered temporary mental health services.

**BRIAN HOYLE**
Justice

Opinion delivered January 10, 2018.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

---

[1] Based on our disposition of Appellant's legal sufficiency complaint, we need not address his factual sufficiency challenge. *See* Tex. R. App. P. 47.1; *see also J.M. v. State*, 178 S.W.3d 185, 197 n.10 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

11



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

### JANUARY 10, 2018

### NO. 12-17-00310-CV

### THE STATE OF TEXAS FOR THE
### BEST INTEREST AND PROTECTION OF G. H.,

Appeal from the County Court at Law

of Cherokee County, Texas (Tr.Ct.No. 42176)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, it is the opinion of this Court that there was error in the order as entered by the trial court below and that the same should be reversed and judgment rendered.

It is therefore ORDERED, ADJUDGED and DECREED by this Court that the trial court's order for temporary inpatient mental health services, be, and the same is, hereby **reversed;** judgment is **rendered** denying the State's application for court ordered temporary inpatient mental health services; and that this decision be certified to the court below for observance.

Brian Hoyle, Justice
*Panel consisted of Worthen, C.J., Hoyle, J. and Neeley, J.*